Approved, SCAO

| | | |
|---|---|---|
| | Original - Court | 2nd copy - Plaintiff |
| | 1st copy - Defendant | 3rd copy - Return |

**STATE OF MICHIGAN**

JUDICIAL DISTRICT

Oakland 6th Busi **JUDICIAL CIRCUIT**

COUNTY PROBATE

**COMPLAINT**

Page1 of 54 pages

CASE NO.
**2022-193417-CB**

**JUDGE MICHAEL WARREN**

Court address

1200 N. Telegraph Road, Department 404, Pontiac, MI 48341-0404

Court telephone no.

248-858-0345

Plaintiff's name(s), address(es), and telephone no(s).

Evelia M. Naranjo, Pro Se
3405 S. Union Ave., Apt #1F
Chicago, IL 60616
Telephone Mobile: (312) 622-8787

Plaintiff's attorney, bar no., address, and telephone no.

Defendant's name(s), address(es), and telephone no(s).

Matt Endre
Dale Sailer
David Cripe
Michael Yellen
BELFOR-Northbrook
BELFOR USA Group Inc.
185 Oakland Avenue, Suite 300
Birmingham, Michigan 48009
Telephone: 248-594-1144
Attention: Chief Operating Officer

0

>, See attached Plaintiffs Complaint
C

0

0

April 1, 2022

Date

Evelia M. Naranjo

Signature

MC 01a (6/19) COMPLAINT

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND
BUSINESS COURT

EVELIA M. NARANJO,

     Plaintiff,    Case No.:

  v.          TRIAL BY 12-PERSON JURY

BELFOR U.S.A., et al.,     Hon.

     Defendants.

EVELIA M. NARANJO, Pro Se
3405 S. Union Ave., Apt #IF
Chicago, Illinois 60616
Telephone: (312) 622-8787
eveliasan@fuller.edu

   There has never been any other civil action between these parties arising out of the same transaction or occurrence as alleged in this complaint pending in this court.

        *&ae€ 7il, 71a,zaktla*
        Evelia M. Naranjo, Pro Se

## COMPLAINT and JURY DEMAND

   Evelia M. Naranjo makes her complaint as follows:

## NATURE OF ACTION

1.  This is a fraud case, and possibly a criminal case, of Plaintiff being hired under false pretenses, misrepresentation and inducement which led to Defendants' unjust enrichment. This case also involves promissory estoppels, unpaid commissions, taking of trade secrets, breach of contract, defamation per se and false pretenses with intent to defraud. Additionally, Defendants retaliated against Plaintiff with discharge in order to avoid proper, due, and promised compensation to Plaintiff. Defendants are former employers of Plaintiff.

1

PARTIES, VENUE AND JURISDICTION

Plaintiff:

2.      Evelia M. Naranjo, is a resident of Chicago, Illinois and was employed from July 22,

2019 thru October 26, 2021 at the BELFOR office located in Northbrook, Illinois.

Defendants:

3.      Listed below are the Defendants as individuals and Defendant companies/corporations

with their known respective senior administrators. The following Defendant

companies/corporations are hereafter referred to as BELFOR.

4.      BELFOR-Northbrook is located in Northbrook, Illinois

        a.      Matt Endre is a resident of Illinois and was General Manager of the Northbrook

office prior to December 31, 2020 and when Plaintiff was hired. Endre is Stockholder of

BELFOR-USA. Hereafter referred to as Endre.

        b.      Dale Sailer is a resident of Illinois and was General Manager of the Northbrook

office after January 1, 2021 and when Plaintiff was terminated. When Plaintiff was hired, Sailer

was Regional Manager. Hereafter referred to as Sailer.

5.      BELFOR USA Group Inc. is located in Birmingham, Oakland County, Michigan

        a.      Sheldon Yellen, CEO, Primary Stockholder of BELFOR-USA.

        b.      Michael Yellen, COO, Primary Stockholder of BELFOR-USA. Hereafter referred

to as Yellen.

        c.      Teresa Williams, Government Vice Chairman of Countrywide Sales and Marketing

        d.      Rusty Amarante, Director of Operations

        e.      Loren Easton, Board Member

        f.      Michael Fisch, Board Member

g.      David Musicant, Board Member

h.      Aaron Maeng, Board Member

i.      David Cripe, Regional Director, resides and works out of the Illinois office. Cripe is Stockholder of BELFOR-USA. Cripe was Regional Director when Plaintiff was hired and terminated. Hereafter referred to as Cripe.

J       Martin Endre, Regional Marketing and Sales Director, resides and works out of the Northbrook, Illinois office.

k.      Teresa Franze, Director of Human Resources. Hereafter referred to as Franze.

6.      Claims in this action are made pursuant to the common law and statutes of the State of Michigan.

7.      Pursuant the Employment Agreement between Plaintiff and BELFOR, Plaintiff presents her action in the Oakland County Court. Plaintiff was pressured and forced to sign the Employment Agreement about one (1) month after Plaintiff started employment. The Employment Agreement contained clauses that were not previously communicated to Plaintiff which put in question financial promises that had been made to Plaintiff during the interview and hiring process. In time, Defendants broke those financial promises they had made to Plaintiff (fraud, fraudulent concealment, promissory estoppels).

8.      The amount in controversy is over $75,000.00 (seventy-five thousand dollars), or over the minimal jurisdictional amount.

9.      Jurisdiction and venue are proper in Oakland County, as it is where BELFOR USA headquarters office is located and from where many of the major decisions regarding and affecting Plaintiff were made.

FACTUAL ALLEGATIONS

3

Introduction: Fraud for the purpose of Unjust Enrichment

10.     This is a fraud case for the purpose of Unjust Enrichment to the benefit of Defendants,

BELFOR USA and its shareholders and specific employees, and to the detriment of Plaintiff.

Defendants wanted access to Plaintiff's multi-million dollar revenue generating and profit

margin increase capabilities, specifically tied to Plaintiff's insurance/adjuster contacts, for their

own enrichment and did not ever intend to pay Plaintiff for those services.  Defendants induced

Plaintiff with false pretenses, false promises, misrepresentations, and fraudulent concealment for

the purpose to defraud Plaintiff and enrich themselves unjustly.

11.     Defendants lured Plaintiff with an appealing offer of a base salary of $75,000/year plus a

4-point guaranteed cumulative commission as Estimator. The 4-point guaranteed cumulative

commission was promised for Plaintiff's roles/assignments as estimator, project manager,

salesperson, and account manager.  Defendants led Plaintiff to believe that they would assign

Plaintiff large commercial jobs and accounts and that the commission would be based on a

significant portion of the $6 million plus annual revenue of the Northbrook, IL BELFOR office.

The offer was commensurate to Plaintiff's background as a good estimator who wrote good,

accurate, and thorough estimates which yielded good revenue and profit margins.  Therefore,

Plaitnff had reasonable reliance of the promises from the Defendants.

12.     When Plaintiff was interview and hired, Defendants specifically instructed Plaintiff to not

market to her multi-million dollar account insurance/adjuster contacts and thus avoided

Plaintiff's inquiry and inferred request to set a specific percent commission for Plaintiff to

market to her multimillion dollar insurance contacts. Defendants instructed Plaintiff to focus on

writing estimates and that BELFOR would assign her jobs and accounts, that she wouldn't have

to market or go look for jobs/accounts because BELFOR has salespeople who do that.

4

13.     BELFOR fraudulently concealed the fact that at the same time that BELFOR was interviewing and hiring Plaintiff, BELFOR was in the process of putting in a place a $1 billion dollar sell-off of the company and needed to raise revenue and/or profits in order for the sale to go thru.

14.     BELFOR needed and sought to acquire Plaintiff's multi-million dollar revenue and profit generating capabilities in order to execute/commence, fulfill, and/or complete the $1 Billion dollar sell.  Specifically, BELFOR set out to acquire Plaintiffs multimillion dollar revenue generating capabilities via Plaintiffs marketing and getting jobs from her multi-million dollar insurance/adjuster contacts.  BELFOR did not have any intention to ever pay Plaintiff for her multi-million dollar generating marketing services for the purpose of effecting the $1 billion dollar sell, so they defrauded Plaintiff with false pretenses, false promises, misrepresentations and fraudulent concealment.

15.     After Defendants hired Plaintiff, they tried to force Plaintiff to market to her multimillion dollar insurance contacts and not pay her for it even though they had specifically told Plaintiff at hiring that marketing would not be part of her position as Estimator. Defendants retaliated by reducing Plaintiff's base salary, denied her the opportunity to earn her commission and denied her the 4-point cumulative commission for her various roles/assignments. Additionally, Defendants stole Plaintiff's trade secrets of estimate writing that yields good and higher revenue and profits. Defendants also denied Plaintiff large loss commercial jobs and accounts. Defendants threatened Plaintiff to fire her if she did not market to her multi-million dollar contacts.  Defendants set-up Plaintiff for failure and blamed her for problems in the office by twisting facts and distorting half-truths.  Finally, Defendants exhibited defamation per se in order to try to manipulate Plaintiff to market to her multi-million dollar contacts. When Plaintiff

continued to complain for lack of payment, refused to market to her multi-million dollar insurance contacts without a written compensation agreement, and complained for the defamation per se, Defendants used the defamation per se to fire Plaintiff and avoid paying Plaintiff her due, proper and promised compensation which Plaintiff had been asking for.

16.     Plaintiff complained for lack of payment and for broken promises of financial gain. Plaintiff refused to market to her multi-million dollar contacts without a specific commission put in writing and the satisfaction of other requirements to protect Plaintiff from Defendants' continually diverting commissions away from Plaintiff in order to avoid paying her due, proper and promised commission.  Although, Defendants did manage to force Plaintiff to market on occasion. Defendants refused to grant Plaintiff a specific commission for her to market to her multimillion dollar contacts and retaliated further when Defendants used defamation per se as the excuse to discharge Plaintiff from employment.

17.     Defendants defrauded Plaintiff for the purpose to unjustly enrich themselves to the detriment of Plaintiff by forcing Plaintiff to market to her multi-million dollar insurance contacts for the ultimate purpose for Plaintiff to execute/commence, fulfill and/or complete the $1 billion dollar sell-off of BELFOR and not pay Plaintiff for her service in effecting the sell-off.

18.     Defendants willingly, knowingly and purposely defrauded Plaintiff for the purpose of their own unjust enrichment to the detriment of Plaintiff. Defendants lured and hired Plaintiff as an Estimator with an appealing compensation which would include a guaranteed cumulative 4-point commission and specifically instructed Plaintiff to not market as that would not be her responsibility. However, Defendants' true intentions were to force Plaintiff to market to her multi-million dollar insurance contacts and not pay her for marketing.  Defendants denied

Plaintiff payment and the promised financial gain and commission and tried to force Plaintiff to market without payment.

19.     Had Defendants not fraudulently concealed their true motives, Plaintiff would have negotiated a deal with a specific compensation and commission commensurate with the tasks required or desired by BELFOR that would have benefitted all parties.  Instead, BELFOR unjustly enriched themselves to the detriment of Plaintiff via fraudulent, unethical, unlawful, and even possibly criminal actions against Plaintiff.

20.     BELFOR made Plaintiff a beneficiary to the $1 billion dollars due to their fraudulent concealment and the fraud, including but not limited to, false pretenses, broken promises, inducements, misrepresentation, breach of contract, fraudulent, unethical, unlawful, and possibly even criminal acts they exhibited against Plaintiff in order to force her to help them execute/commence, fulfill, and/or complete the $1 billion dollar sell. Therefore, Plaintiff claims damages and seeks relief pertinent to the $1 billion dollars and to the other damages related to the unjust enrichment based on the fraudulent concealment and the promise that Defendants made to Plaintiff for financial gain, specifically but not limited to BELFOR's promise to Plaintiff of the guaranteed, cumulative 4-point commission for her roles/assignments as estimator, project manager, salesperson, and account manager, among other promises that BELFOR made to Plaintiff regarding financial gain.

21.     To summarize Defendants' fraud in how Defendants avoided paying Plaintiff her guaranteed cumulative 4-point commission for their and BELFOR's unjust enrichment to the detriment of Plaintiff, as detailed throughout this Complaint: 1) Defendants lured Plaintiff to work for BELFOR by promising her an appealing compensation that would include a guaranteed cumulative 4-point commission if the minimum revenue was met in order to effect the awarding

7

of the commission, 2) Defendants would not assign Plaintiff enough revenue to meet the minimum revenue needed to award Plaintiff the guaranteed cumulative 4-point commission, thus Defendants prevented Plaintiff from earning the commission, 3) Defendants prevented Plaintiff from earning the commission by assigning non-estimators into the estimator role instead of assigning Plaintiff, an Estimator, into the estimator role, 4) non-estimators, such as Project Managers, who are assigned as estimators on jobs, instead of Plaintiff being assigned as an estimator on the jobs, do not have a guaranteed commission for the role of estimator that an Estimator has, therefore, the Project Manager does not get a guaranteed commission for the role of estimator, 5) by assigning a non-estimator, such as a Project Manager, to the role of estimator on a job, Defendants avoid paying commission altogether, no commission to the Estimator and no commission to the Project Manager, 6) thus, Defendants divert the guaranteed cumulative 4-point commission away from the Estimator, that is Plaintiff, and onto BELFOR for BELFOR's and Defendants' unjust enrichment to the detriment of Plaintiff. Additionally, the commission table for the Estimator is written vaguely and is interpreted at Defendants' whim and re-interpreted to deny the 4-point commission.

22.     This fraudulent scheme to avoid paying commission to the Estimators by diverting the commission away from the Estimators and onto Defendants' pockets is a systemic fraudulent scheme that is practiced against other Estimators, in addition to Plaintiff.  Similarly and in reverse, a similar fraudulent scheme is practiced against Sales Person by forcing Estimators and Project Mangers to market. By forcing Estimators, such as Plaintiff, to market and not pay Plaintiff commission to market is a way for Defendants to avoid paying sales and marketing commission to Sales Persons and thus divert sales commission away from Sales Persons and onto Defendants' pockets. By swapping assignments, such as but not limited to assigning Project

Managers as estimators and by forcing Estimators to market, is a way for Defendants to avoid paying promised, due and proper guaranteed cumulative 4-point commissions to all their employees and divert those commissions onto themselves for the unjust enrichment of the Defendants to the detriment of Plaintiff and other employees.

Plaintiff's Multi-Million Dollar Revenue and Profit Generating Capabilities

23.   Plaintiff has multiple capabilities that can generate revenue and profit for a restoration company, such as BELFOR. Plaintiff obtained these capabilities through many years of working in the insurance consulting and restoration industries.  Plaintiff's multi-million dollar revenue and profit generating capabilities include but are not limited to the following.

a.   Insurance Contacts with Multi-Million Dollar Accounts: As an insurance consultant for many years, Plaintiff consulted insurance representatives such as adjusters, on multiple multi-million dollar jobs with multi-million dollar restoration costs ranging from $2 million to $19 million dollars per loss, specifically commercial buildings.  The type of multi-million dollar losses that Plaintiff consulted on included but were not limited to damages from fire, water, and hurricane. Plaintiff has contacts in the insurance and business sector (insured) who have multi-million dollar accounts. Meaning, if these contacts have a loss, their loss and restoration costs could be in the millions of dollars per loss. It is extremely difficult to find a person with such contacts and such a person is highly valuable among restoration companies as such a person, as Plaintiff, has the capabilities to generate millions of dollars for the restoration company, such as BELFOR. Large loss restoration jobs can generate between 35% to 75% profit margins.  As an example, in a $5 million dollar restoration job that takes 2 months to complete, a restoration company may make a profit between $1.75 to $3.75 million dollars.  A $3.75 million dollar profit made in two months is the type of reason why people are in the restoration business.

9

b.      Writing Xactimate Estimates: Plaintiff has advanced training and practice is writing estimates in Xactimate program. The Xactimate estimates are used in the insurance and restoration industries as invoices and proposals/bids and are used as contracts for work that was performed and/or work to be performed.  To be a good Xactimate estimate writer and to write clean, thorough and accurate Xactimate estimates that produce a good margin of profit, a person must be knowledgeable in the technical aspects of the restoration and building industry and in the technical aspects of the Xactimate program. Plaintiff has knowledge of both and is a very good Xactimate estimate writer.  It is extremely difficult to find a person who has good working knowledge of both and who is a good Xactimate estimate writer.  Plaintiff's good Xactimate estimate writing skills produce good profit margins and increased revenue for restoration companies. Plaintiff's good Xactimate estimate writing skills can help increase the revenue and margin of profit in estimates, that is invoices, of restoration companies, such as BELFOR, by approximately in the range of 10% to 33%--due to shortage of good Xactimate estimate writers in the industry.  Plaintiff's good Xactimate estimate writing skills are highly sought after as they are difficult to find and are profitable for a restoration company. As an example, with Plaintiff's good, that is, thorough and accurate, Xactimate estimate writing skills applied to $10 million dollars of estimates, a restoration company such as BELFOR can increase their revenue/profit margin by about $1 million to $3.3 million dollars simply by writing good, thorough and accurate, Xactimate estimates.

c.      Administration and Trade Secrets: Plaintiff has background in administration and management including, but not limited to, restoration projects in the multi-million dollar range per loss. Plaintiff also has teaching background and has the capabilities to lead a team into a successful completion of a multi-million dollar project.  Such skills are also difficult to find

and also highly sought after by restoration companies. Plaintiff's skills are highly sought after by restoration companies for the purpose of managing large losses and projects but also for the purpose of teaching and transferring Plaintiff's skills to other employees in order to multiply within the company the variety of revenue and profit generating capabilities of Plaintiff, including but not limited to writing good Xactimate estimates which Plaintiff considers as part of her trade secrets. At hiring, Plaintiff told Endre in writing via a text message that her good estimate wring skills are her trade secrets.

Buying and Selling a Restoration Company

24.     When buying and selling a restoration company, the two parties typically have a trial period when requirements set by the buying company are to be fulfilled by the selling company. Requirements typically include but are not limited to a target minimum for revenue and/or profit or profit margin.  Meaning, the selling company has to show a particular revenue or profit within a specified time after the contract has been executed or commenced in order for the contract to be fulfilled and completed.  If the target minimum is not met by the selling company, then the contract is made void and no sell-buy occurs.

25.     With regards to BELFOR in this case, on June 10, 2019 a public announcement was made that BELFOR had been sold for $1 billion dollars.  What was not publicly disclosed is that BELFOR was given two years, until June 30, 2021, to show a specified minimum revenue and/or profit or profit margin in order for the contact to be fulfilled and completed. If BELFOR failed in meeting the minimum targets as required, then the deal was off and no sell-buy would occur. Concurrently, BELFOR interviewed plaintiff on June 6, 2019 for employment and BELFOR set in place the fraudulent activity against Plaintiff for their own unjust enrichment pertinent to and around the same time that the $ 1 billion dollar sell-buy deal was being put in place. BELFOR

11

failed in meeting the minimum requirements and was given a one-year extension, until June 30, 2022 to fulfill the minimum requirements of the revenue and profit/margin targets.

26.     Plaintiff became aware of these buy-sell requirements, lack of fulfillment, and extension of the trial period around the time that BELFOR fired Plaintiff, which was October 26, 2021. Plaintiff was first interviewed for employment on June 6, 2019, four days prior to the public announcement of the $1 billion dollar sell, and eventually was hired by BELFOR shareholders who were and are set to gain a percentage of the $1 billion dollar sell.

27.     Plaintiff alleges that the fraud and torts, as detailed in this Complaint, that BELFOR shareholders and employee exhibited against Plaintiff were made against Plaintiff for the primary purpose of forcing Plaintiff, without pay, to help execute/commence, fulfill and/or complete the $1 billion dollar sell.

Thematic and Chronological Sequence of Events

Introduction

28.     BELFOR shareholders and employees, starting from the interview and hiring process thru employment and up to the termination of Plaintiff's employment, exhibited various dishonest, unethical, fraudulent, deceptive, unlawful, and even possibly criminal practices against Plaintiff, including but not limited to misrepresentation, hired under false pretenses,  inducement, fraud in the inducement of a contract, broke promises (promissory estoppels), detrimental reliance, false pretenses with intent to defraud (penal code 750.218 (7)(a)), nepotism (MCL 15.342), defamation Per Se (MCL 600.2911), breach of contract (MCL 600.5807), retaliation, retaliatory discharge to avoid payment (common law; MCL 408.483; FSLA), spread contempt and boycott, coercion (MCL 750.462a; 42 U.S. Code 3617), intimidation and threats (42 U.S. Code 3617), work without pay, forced labor (MCL 750.462a; 18 U.S. Code 1589; 42 U.S. Code 3617; 42 U.S.

Code 12203), unpaid commission (MCL 600.2961), tried to force Plaintiff to break the law by trying to force Plaintiff to commit fraud and unjust enrichment to the detriment of self/Plaintiff and of others, fraudulent concealment (MCL 600.5855), taking of trade secrets, and give false hope to Plaintiff of things getting better in order to induce Plaintiff to not file legal action. These were exhibited in order to force Plaintiff to work without proper, due and promised compensation for the unjust enrichment of BELOR to the detriment of Plaintiff.

29.     The ultimate purpose of the fraud and torts and Unjust Enrichment against Plaintiff were to force Plaintiff to generate revenue and profit in order for Plaintiff to help execute/commence, fulfill, and/or complete the $1 billion dollar sell-off of BELFOR without paying Plaintiff her due, proper, and promised compensation.

30.     The following events are detailed in a thematic and chronological sequence.

Employment Interview, Offer, and Hiring

31.     Around April of 2019, Plaintiff asked Hope Folk, a specialist in mergers and acquisitions for Restoration Personnel Services (RPS), to assist Plaintiff find employment. Folk in the following weeks connected Plaintiff to various restoration companies and Plaintiff obtained various job offers, including to/from BELFOR.

32.     On June 6, 2019, Plaintiff had a phone interview with Matt Endre. The following was discussed, including but not limited to:

        a.      Endre asked Plaintiff about her Xactimate writing skills and profit margin percents. Plaintiff responded that for repairs her profit margin range was low 40s to mid 50s and for mitigation from 50s to 70s, for an average of mid 40s to low 50s, approx.;

        b.      Endre was aware of Plaintiff's background and past experience as consultant for insurance/adjusters on multi-million dollar jobs and asked Plaintiff about her experience with

commercial jobs and her contacts with the insurance companies and adjusters. Plaintiff communicated to Endre that she still keeps in touch with some adjusters who she worked with and who were very pleased with Plaintiff's work product and consult on their multi-million dollar losses and restoration projects, specifically commercial buildings. Plaintiff clarified that she does not have a book of business, thus business from her insurance contacts is not guaranteed;

       c.     Endre said to Plaintiff that he wanted to continue the interview process in-person.

33.     On June 17, 2019, Plaintiff met with Endre at his BELFOR office located in Northbrook, Illinois. The following was discussed, including but not limited to:

       a.     Endre stated that the Estimator position includes a base salary plus a guaranteed commission if the minimum revenue for calculating the commission is met;

       b.     Endre stated that the commission is a 4-point commission, that the Estimator gets points/credits for commission in addition to her estimator role/assignment, the other  three roles/assignments are for project manager, salesperson, and account manager;

       c.     Plaintiff asked what is the total 4-point commission. Endre did not answer specifically and stated that it varies job to job because the Estimator may not always be written into a job for all four assignments.

       d.     Endre led Plaintiff to believe that the commission percentage would increase as the Estimator was credited with more assignments based on the 4-point commission system. Meaning, the more times that the Estimator's name appears on the job's assignments, then the more points/credits will be earned for the purpose of calculating the commission for that job.

       e.     Endre stated that the Northbrook office makes about $6 million a year in revenue and led Plaintiff to believe that her commissions would be based on such high revenues.

   f.  Plaintiff asked for $75,000 as base salary, Endre agreed;

   g-  Endre stated that he as General Manager is the one who assigns the leads/jobs to

the Estimators, thus he is the one who assigns the revenue to the Estimators, the revenue that is

used to calculate the guaranteed commission;

   h.  Plaintiff brought up the subject of her marketing to her multi-million dollar

account insurance/adjuster contacts for the purpose of negotiating a specific marketing percent

commission for that specific task.  Endre responded that he does not want Plaintiff to market to

her multi-million dollar contacts, that BELFOR has sales and marketing people who are

responsible for that. Endre said that he wanted Plaintiff to concentrate on writing Xactimate

estimates.

   i.  In a text message around the time of this interview meeting, Plaintiff stated that

her Xactimate estimate writing is a trade secret.

   J  Plaintiff was not aware at the time, but in retrospect, Plaintiff recognizes this

meeting on June 17, 2019, as the start of many unethical, fraudulent and even criminal actions

against Plaintiff for the purpose of unjust enrichment to the detriment of Plaintiff.

34.  On June 27, 2019, Endre made a verbal offer over the phone to Plaintiff and asked her to

meet him at his BELFOR Northbrook, IL office to discuss further.

35.  On July 3, 2019, Plaintiff met with Endre at the BELFOR Northbrook, IL office and Dale

Sailer joined the meeting as a participant and a witness. At the time, Sailer was Regional

Manager, while Endre was the General Manager of the Northbrook office. The following was

discussed, including but not limited to:

   a.  Endre told Plaintiff that he was not allowed to offer Plaintiff a base salary of

$75,000/year. The Estimator position has a base salary of $60,000/year and to compensate the

difference, he/BELFOR would give Plaintiff a commission advance of $15,000/year. Endre assured Plaintiff that the $75,000/year base/minimum would be secured throughout her employment and Endre shook hand with Plaintiff at that promise with Sailer as a witness;

      b.      The 4-point commission system was not mentioned, therefore, Endre did not retract the 4-point commission system and Plaintiff continued in her understating as previously led to believe by Endre that her commission percentage would increase based on the 4-point commission system;

      c.      Plaintiff again brought up the subject of marketing to her multi-million dollar insurance/adjuster contacts and Endre again, this time with Sailer as witness, instructed Plaintiff that she would not be doing marketing to her insurance contacts.

      d.      At the end of the meeting, Plaintiff accepted the offer and told Endre that she was looking for long-term opportunities at BELFOR, meaning she wanted to be at BELFOR for many years and retire from BELFOR. Endre concurred that the offer was for such a long-term. Plaintiff took Endre's concurrence as a promise.

      e.      Plaintiff was not aware at the time, but in retrospect, Plaintiff recognizes this meeting on July 3, 2019, as the continuation of many unethical, fraudulent and even possibly criminal actions against Plaintiff for the purpose of unjust enrichment to the detriment of Plaintiff.  This time, Sailer was actively participating in the coordinated efforts against Plaintiff. Later, Cripe would join them in the coordinated efforts against Plaintiff. Later in time, these individuals broke their promises and assurances which they had used to lure Plaintiff to work for BELFOR and to sign the Employment Agreement while at the same time intimidated and threatened Plaintiff to do marketing to her mufti-million dollar insurance contacts without pay in order to raise revenue.

36.     On July 8, 2019, BELFOR emailed Plaintiff a one-page offer letter that broke down the $75,000/year base/minimum salary as $60,000 as base and $15,000 as advance commission. The letter had in small print that further details of the salary and commission are included in the Employment Agreement of which she did not receive a copy and which she was pressured and forced to sign one month after her employment began.

37.     Throughout the interview, offer, and hiring process, Plaintiff communicated with Folk. Plaintiff informed Folk of BELFOR's offer of $75,000 base/minimum salary, the 4-point commission system, and the long-term employment promise from Endre.

38.     Plaintiff was interviewing with other restoration companies and had other offers besides the offer from BELFOR.

39.     Plaintiff alleges that BELFOR made an appealing offer with misrepresentations and false promises in order to induce Plaintiff to work for BELFOR and not accept offers from the other restoration companies.

BELFOR Announces $1 Billion Dollar Sell

40.     On June 10, 2019, four (4) days after Plaintiff's first interview with Endre, the public announcement was made that BELFOR sold for $1 billion dollars. At the time that Plaintiff was being interviewed and hired, the BELFOR shareholders and employees who were interviewing and hiring Plaintiff did not make Plaintiff aware of the pending or executed sell.

41.     Plaintiff was fired, Retaliatory Discharge, on October 26, 2021. Around that time, Plaintiff became aware of the sell requirements, as follows:

        a.     The buying company gave BELFOR two years to show a specific revenue and/or profit minimum, from July 1, 2019 thru June 30, 2021.

b.      By June 30, 2021, BELFOR had not met the minimum revenue/profit

requirements.

c.      The buying company gave BELFOR a one-year extension to show the required

minimum revenue/profit, thru June 30, 2022.

42.    Plaintiff alleges that the coordinated efforts of various individuals, including

shareholders, at BELFOR to exhibit unethical, fraudulent, unlawful and possibly even criminal

acts against Plaintiff were for the purpose of unjust enrichment to the detriment of Plaintiff for

the ultimate purpose of forcing Plaintiff, without pay, to help execute/commence, fulfill and/or

complete the $1 billion dollar sell of BELFOR.

Job Assignments, Employment Agreement, Contempt, Hostility, Set-up for Failure,

Retaliation, Trade Secrets, Estimator Profit Margin, Diverted Commission, Marketing

Job Assignments

43.    July 22, 2019 was Plaintiff's first day of employment at BELFOR's Northbrook, IL

office.

44.    Endre was assigning low-revenue residential leads/jobs to Plaintiff and was listing

Plaintiff in multiple assignments for those jobs, such as the assignments of estimator, project

manager, salesperson, lead generator, and account manager.  Due to the multiple assignment

roles, Plaintiff was under the impression that per the 4-point commission system her commission

percent would increase. Endre was also assigning Plaintiff to commercial jobs with the potential

of high revenue; Plaintiff was under the impression that Plaintiff would be getting more high-

revenue commercial jobs. Initially, things looked hopeful and somewhat consistent to Endre's

promises and assurances as per the conversations during the interview and hiring process.

Employment Agreement

18

45.     On August 15, 2019, about a month after Plaintiff started employment, Cripe, a BELFOR shareholder and Regional Manager, visited the Northbrook, IL office to have Plaintiff sign the Employment Agreement which she had not seen before.

        a.      Endre handed the Employment Agreement to Plaintiff. Plaintiff was rushed and pressured to sign right away.  Plaintiff signed under pressure without reading.

        b.      After reading the agreement that evening, Plaintiff noticed a clause that would allow BELFOR to reduce Plaintiff's base salary, that is, reduce, remove or pay-back the $15,000/year advanced commission that had been promised to Plaintiff by Endre in order to pay Plaintiff $75,000/year as base/minimum as promised by Endre during the interview and hiring process.

        c.      Plaintiff immediately that evening emailed Endre and after a few email exchanges between Endre, Plaintiff and Cripe, Endre via email assured Plaintiff that Plaintiff's advanced commission of $15,000/year would not be reduced or removed, that is, Plaintiff would not be required to pay-back the advanced commission.

        d.      The Employment Agreement contained the one-page document of BELFOR Estimator Commission Program.  The commission page states that all other assignment fields, apart from the estimator assignment field, will be used for discretionary bonus consideration.  At first glance, that statement did not seem to contradict the 4-point commission program that Endre offered Plaintiff during the interview and hiring process. Sailer in 2020 and Franze in 2021 confirmed to Plaintiff that Plaintiff could concurrently earn commission for both, for the estimator assignment and for the salesperson assignment.

        e.      To be clear, the BELFOR Estimator Commission Program page does not explicitly deny or contradict the 4-point commission system, it allows it.

f.      Plaintiff alleges that the BELFOR Estimator Commission Program page is vague and not defined consistently and that it is defined at whim, paired with misrepresentation and fraud, in order to produce desired results such as unjust enrichment for BELFOR and forced work without pay under the guise and protection of a signed contract, for the benefit of BELFOR and to the detriment of Plaintiff or employees.

g.      Plaintiff alleges that the reason BELFOR waited a month after Plaintiff started her employment to present Plaintiff with the Employment Agreement and pressured her to sign right away was to pressure her and force her to accept yet another possible reduction to her compensation by sneaking in clauses at the last minute and thus eventually breach their fiduciary promises to Plaintiff as offered during the interview and hiring process.

Contempt, Hostility, Set-up Plaintiff for Failure, Retaliation, Trade Secrets

46.      Regarding public contempt, hostility and setting-up Plaintiff for failure, Endre and Sailer exhibited several of these efforts starting in the fall of 2019, which was shortly after Endre and Cripe forced Plaintiff to sign the Employment Agreement. Following are two examples; this is not a complete list.

47.      During the hiring process, Plaintiff had communicated to Endre that she/Plaintiff had never served on-call to receive emergency calls after-hours. In the fall of 2019, during one of the days that Plaintiff was on-call. Plaintiff received a call late at night about a tree that had fallen on a house, it was raining.  Plaintiff spoke with the Project Manager on-call and also with Endre to find out how they wanted to address the situation with the homeowner. Plaintiff was new to BELFOR and new to on-call responsibilities and was seeking direction. Days later, Plaintiff overhead Endre tell the administrative assistant, in a voice loud enough for others in the office to hear, that based on that incident Plaintiff didn't know what she was doing, that Plaintiff was not

what he had expected.  Endre circulated this to others, including his brother Martin Endre,

Regional Director of Sales and Marketing, who months later reiterated Endre's' misrepresented

and half-truth accusation alluding that Plaintiff was not trustworthy.

48.      Another example, Plaintiff sought Endre's recommendation for a wood floor specialist to

assess and possibly repair/replace an exotic wood floor for a client.  Endre told Plaintiff to call

Yonan Flooring.  Plaintiff contacted Yonan and hired Yonan to repair part of the flooring per

Yonan's scope recommendation.  The repair was a disaster and was not performed according to

Yonan's own scope and proposal.  Plaintiff asked Yonan to fix their mistakes.  Yonan refused.

Months later, Sailer as the General Manager got involved and settled the disagreement by asking

Yonan to accept as payment half the contact amount, $2,000 instead of $4,000, approximately.

Shortly after, Sailer referenced this disagreement and used it to accuse Plaintiff of putting in

jeopardy BELFOR's long-standing relationship with Yonan. The contract difference in dispute

was for about $2,000.  Shortly after that accusation, Plaintiff found out that Yonan had made a

$100,000 mistake on another BELFOR job for Endre and was forced to pay for it. Plaintiff was

informed that it was that $100,000 mistake from Yonan on a job for Endre that soured Yonan's

relationship with BELFOR, not Plaintiff's little $2,000 payment difference.  Sailer, like Endre,

and in an effort to divert blame away from Endre and onto Plaintiff for the soured relationship

with Yonan, misrepresented Plaintiff with half-truths and twisting of facts in order to make

Plaintiff look professionally untrustworthy. Also, after the Yonan unprofessional work

performed for Plaintiff on the exotic wood floor, Plaintiff inquired and two other employees at

the Northbrook office advised Plaintiff to never hire Yonan for anything other than carpet

because Yonan does not have qualified workers for other flooring such as exotic wood floor, and

that everyone knows that.  Plaintiff alleges that Endre and Sailer set-up Plaintiff for failure and to

take the blame for the soured relationship with Yonan when Endre instructed Plaintiff to hire Yonan for the exotic wood floor and when Sailer blamed Plaintiff for putting the relationship with Yonan in jeopardy.

49.     Plaintiff alleges that Endre, Sailer, and Martin Endre portrayed Plaintiff in a negative light in order to try to justify diverting high revenue jobs away from Plaintiff and on to themselves and BELFOR, thus divert promised and guaranteed commissions away from Plaintiff and not allow Plaintiff to earn her guaranteed cumulative 4-point commission.

50.     Additionally, after Endre and Sailer had been using contempt and hostility to divert commission away from Plaintiff, Plaintiff further alleges that they used those actions to try to force Plaintiff to market to her multi-million dollar account insurance/adjuster contacts.

51.     After Plaintiff refused to market to her multi-million dollar insurance contacts without a specific written agreement, Endre and Sailer retaliated against Plaintiff by assigning Luis Lopez, a Project Manager, in the role of estimator to further divert commission away from Plaintiff and unto BELFOR's pocket. Additionally, Endre had previously forced Plaintiff to share her trade secret estimates with Lopez and now Lopez was being assigned as estimator instead of Plaintiff.

Estimator Profit Margin

52.     When Endre interviewed and hired Plaintiff, Endre instructed Plaintiff to focus on writing estimates, specifically, on Xactimate program. At the same time, Endre instructed Plaintiff that Plaintiff would not be doing marketing to her million dollar insurance contacts.

53.     Plaintiff's good Xactimate writing skills fulfilled and surpassed Endre's expectations. For the year 2020, Plaintiff had the highest profit marking in the Northbrook office and the second highest profit margin for the region, at approximately 48% combined (to be verified).

54.     In conversations with Sailer regarding Plaintiff's good/high margins, Sailer minimized Plaintiff's accomplishments by saying that more important than profit margin is raising revenue via marketing. Sailer said this to Plaintiff several times at various conversations and also said it at office staff meetings. Good estimates raise revenue, but Sailer was referring specifically to marketing. In retrospect, Plaintiff perceived Sailer's downgrade of Plaintiff raising profit margins as part of his effort to manipulate and force Plaintiff to do marketing to her multi-million dollar contacts.

55.     The 2020 year saw lower revenue than usual, but the Northbrook office was able to generate a profit and not lose money partly due to the office's increased profit margin compared to previous years.  Sailer admitted to the office staff at a meeting that the profit margin helped put the office in the positive revenue and avoid negative revenue.  Yet, Sailer refused to credit Plaintiff for her good/high profit margin.

Diverted Commission, Marketing

56.     The Employment Agreement includes the commission scale which guarantees the Estimator the estimator commission if the minimum revenue is met.  That scale also indicates that the minimum revenue is not a quota; it's a minimum revenue only for the purpose of allocating the guaranteed commission to the Estimator.  Meaning, the Estimator does not have to market or generate work, BELFOR with its Sales and Marketing people generate the work. The General Manager assigns the jobs as they come in, thus the revenue that guarantees the estimator commission to the Estimator is assigned by the General Manager.  If the minimum revenue is not met, then the Estimator does not get the guaranteed estimator commission.  Therefore, for the Estimator to get the estimator guaranteed commission is dependent on the General Manager's lead/job assignments. Also, the Employment Agreement is open to the 4-point commission

system; it does not specifically deny the 4-point commission system.  Plaintiff was promised the
4-pointt commission system upon hiring and confirmed on at least two separate occasions by
Sailer and Franze, the Human Resources director.

57.    Both General Managers, first Endre then Sailer, diverted estimator commission away
from Plaintiff by assigning non-Estimators such as Endre, Martin Endre, and Lopez as estimators
instead of assigning Plaintiff as estimator, specifically on high revenue commercial jobs.  By
doing so, BELFOR avoided paying commission to the Estimator, which is Plaintiff.  Also, by not
paying Plaintiff her commission BELFOR was able to raise the profit for itself, BELFOR.
Plaintiff alleges that the diverting of commission away from the Estimators is for the ultimate
purpose of raising profit for BELFOR and its shareholders.

58.    For the first three semesters, Endre did not give Plaintiff enough leads/jobs for Plaintiff to
meet the minimum revenue to effect the awarding of commission.  At the fourth semester, Sailer
did assign Plaintiff enough revenue but Sailer also reduced Plaintiff's advanced commission. The
end result is that the reduction was greater than the increase, so the total compensation for
Plaintiff was lower than previous semesters, thus Plaintiff actually had a decrease in salary/
compensation which was less than $75,000/year. Endre had promised to Plaintiff in writing via
an email that her $75,000 base/minimum would not be decreased and Sailer had witnessed the
hand-shake of that promise. Additionally, the Employment Agreement in section 7b states that,
"This Agreement may not be modified unless in writing, signed by both parties." Plaintiff never
agreed to the reduction in advanced commission, Plaintiff verbally and in writing opposed the
reduction of the advanced commission. Yet, BELFOR, without Plaintiff's consent or signature,
reduced Plaintiff's advance commission which is guaranteed to her in the Employment Agreement
per section 4b.

59.     In the spring of 2020 (to be verified), Sailer made a comment at an office staff meeting of the importance of marketing to insurance/adjuster contacts for the purpose of generating revenue. This was the first of many instances and with more severity at later times where Sailer would try to manipulate, force and eventually threaten and direct defamation per se at Plaintiff in an effort to make Plaintiff do marketing to Plaintiff's multimillion dollar insurance/adjuster contacts and for Plaintiff to not get any commission/percentage for marketing.

60.     In the spring of 2020, Endre held a phone conference with the staff to instruct them to market for COVID-19 cleaning jobs.  Endre had made Martin Endre as the only person running the COVID-19 cleaning jobs.  Endre asked everyone in the office to market. However, Endre directed the conversation directly and firstly to Plaintiff, to ask her what she was long to market. Plaintiff responded in the witness of the other attendees by saying that he/Endre hired her as Estimator and that he/Endre had specifically instructed Plaintiff to not market when he/Endre hired her.  Additionally, in the course of that conference call and following a few questions for clarification by the Estimators, Endre confirmed that he wanted Plaintiff and the others to market but that Martin Endre would be listed as estimator on those jobs brought in by the Estimators.  In other words, Endre wanted Plaintiff, an Estimator, to market to her multimillion dollar insurance/ adjuster contacts to get jobs for which Martin Endre, a sales person and director of marketing, would be the estimator and not Plaintiff and Plaintiff would not be earning any commission/ percentage for either estimating or sales/marketing.

61.     In the summer of 2021, Plaintiff found out that the BELFOR office in Lisle, Illinois also diverts commission away from the Estimators by assigning the Project Mangers as the estimators, specifically on high revenue commercial jobs.

62.     Additionally, subsequent to the 2020 tornado catastrophe in Cedar Rapids, Iowa, Plaintiff was asked if she could volunteer as an Estimator; Plaintiff was told that volunteering would look good and open doors for her at BELFOR. When Plaintiff arrived in Cedar Rapids, she was not assigned to a job as an Estimator. Instead, Plaintiff was asked to do marketing, meaning go out and look for jobs and try to get work. Specifically, BELFOR asked Plaintiff to reach out to her adjuster/insurance contacts. Plaintiff went out to look for work for BELFOR. In retrospect, Plaintiff alleges she was lured to go to Cedar Rapids for the sole purpose of making Plaintiff reach out to her adjuster/insurance contacts in order to market and get high revenue commercial insurance jobs and not pay Plaintiff for marketing.

63.     In 2021, Sailer assigned Plaintiff to a few leads for Plaintiff to submit bids, that is, compete with other major restoration companies. Presenting bids is doing sales but it is also doing marketing. Additionally, it is difficult for BELFOR to compete this way with other restoration companies as BELFOR's costs are typically higher than that of the competitors. Sailer was forcing Plaintiff to do marketing and also setting her up for failure. Plaintiff did submit a few bids that summer, some smaller ones were won and some were pending awarding when Sailer fired Plaintiff. Plaintiff alleges that Sailer was giving Plaintiff big jobs to bid on as a way to give her hope that things were improving following Plaintiff's complaint of diverted commission. Plaintiff alleges that Sailer was giving Plaintiff false hope in order to prevent Plaintiff from filing a legal complaint, that is, a lawsuit. In actuality, Sailer was setting up Plaintiff for failure and forcing her to do marketing in difficult markets as it is very difficult to win a competitive bid due to BELFOR's high production costs and requirements to meet a minimum profit margin. Sailer was assigning the secure high revenue commercial jobs and accounts to Lopez instead of Plaintiff thereby avoided paying Plaintiff the guaranteed

26

commission and possibly avoiding paying employees commission altogether as Sailer was possibly also not paying Lopez, a Project Manager, any commission (to be verified) for his role as estimator.

64.     Additionally, regarding winning jobs and bids, others in the office, including Lopez, would defraud the BELFOR subcontractor in order to decrease the cost of producing the job which would increase the profit margin for BELFOR.  Others in the office, including Lopez, Endre, Martin Endre, and others, would defraud the BELFOR subcontractor in order to either increase the profit margin of the job or to lower the bid/proposal to the client in order to convince/ lure the client to award the job to BELFOR.  BELFOR pressured Plaintiff to do the same, but Plaintiff would refuse to defraud the subcontractor for either purpose.

65.     Of the approximately $6 million dollars per year revenue of the Northbrook office, Plaintiff would not get any commission despite having been promised the 4poiont commission system.  On the contrary, Plaintiffs promised $75,000/year minimum/base decreased just before BELFOR fired Plaintiff. Endre, Sailer, and Cripe made financial misrepresentations for the purpose of their own and BELFOR'S unjust enrichment to the detriment of Plaintiff.

Sailer as General Manager of BELFOR-Northbrook, Initial Complaint to Human Resources, Threat to Discharge Plaintiff for Lack of Marketing

66.      On January 1, 2021, Sailer began his new role as General Manager of the Northbrook, IL BELFOR office. As the new GM, Sailer was now Plaintiff's supervisor and the person who assigned leads/jobs, that is revenue to the Estimators. The office practice is for the GM to meet with every Estimator individually every two weeks to go over the status of the Estimator's jobs, called the JIP meetings. JIP is the acronym for jobs in progress.

27

67.     Early in 2021, during a JIP meeting, Plaintiff asked Sailer if Sailer was going to assign Lopez as estimator on jobs, as Endre had done. Sailer said no.

68.     Two weeks later, at a subsequent JIP meeting, Sailer told Plaintiff that he would be assigning Lopez as estimator as he/Sailer deemed appropriate.  Sailer also told Plaintiff that he/Sailer would be reducing Plaintiff's advanced commission.  The $15,000/year advanced commission had been used to supplement Plaintiffs base salary of $60,000 in order to meet the amount that Endre had agreed to pay Plaintiff as her base/minimum salary when Endre hired Plaintiff. Sailer was present and was a witness to when Endre and Plaintiff shook hands at Endre's promise for the advanced commission to guarantee Plaintiff's base/minimum of $75,000/ year.  Plaintiff has an email from Endre, after Plaintiff started employment, where Endre reassured Plaintiff that her advanced commission would not be getting reduced by assuring Plaintiff that she would not have to pay back an advanced commission. Sailer, who was a witness and participant to the promise with the hand-shake on July 3, 2019, was now reducing the advanced commission and thus reducing Plaintiffs compensation, which was a breach to the promise and a breach to the Employment Agreement.

69.     Reduction of the advanced commission, diverted commission and Lopez as estimator prompted Plaintiff to submit a complaint to Teresa France, Directory of Human Resources, David Cripe, Regional Director and Shareholder, and the three primary owners/shareholders and administrators for BELFOR, Teresa Williams, Michael Yellen, and Sheldon Yellen, to request their assistance and intervention.  In the following days and weeks, the following was addressed between the three, Sailer, Franze and Plaintiff via Skype meetings.  On occasion, Franze and Plaintiff spoke on the phone.

a.      Plaintiff explained to Franze that the advanced commission cannot be reduced per verbal and written assurances from Endre and per Employment Agreement. Plaintiff also explained to Franze how Endre and now also Sailer diverted and will continue to divert commission away from Plaintiff. Also, Plaintiff explained to Franze that Plaintiff is not to do any marketing, specifically to her multimillion dollar account insurance/adjuster contacts per initial instructions from Endre at hiring and per the Employment Agreement. Employment Agreement specifically states that the minimum revenue to effect the commission is not a quota, which confirms that Plaintiff does not have to market.

b.      On all subjects of Plaintiffs complaint, reduced advanced commission, diverted commission that denied Plaintiff from earning commission, and forced to do marketing, Franze on behalf of BELFOR upheld Sailer's position and said to Plaintiff that Sailer was not doing anything wrong and that Plaintiff should be doing marketing as Sailer was trying to force Plaintiff to do.  Plaintiff disagreed and asked for a third-party mediator. Franze on behalf of BELFOR and Sailer said no to a mediator.

c.      During one of the Skype meetings between Sailer, Franze and Plaintiff, Sailer threatened Plaintiff with discharge if she did not market, specifically to her multimillion dollar account insurance/adjuster contacts.  Sailer specifically stated, in front of Franze, that Plaintiff's compensation could be used elsewhere in the company for the benefit of BELFOR, meaning for the purpose of increasing of revenue for BELFOR, as the justification to fire Plaintiff. Sailer made a direct link between the threat of firing Plaintiff and his efforts to force Plaintiff to market to her multi-million dollar contacts.

d.      Soon after, Sailer reduced Plaintiff's advance commission without Plaintiff's consent. The reduction request from Sailer was approved and signed by David Cripe and Mike

Yellen; both are shareholder of BELFOR and set to gain in the $1 billion dollar sell-off of BELFOR.

    e.      Sailer gave more leads/jobs to Plaintiff than Endre had done that enabled Plaintiff to meet the minimum revenue for earning commission at commission period ending on June 30, 2021.  Plaintiff was hopeful that maybe things were changing for the better.  Plaintiff alleges that BELFOR and Sailer were giving Plaintiff false hopes in order to pacify Plaintiff and avoid a legal complaint in the form of a lawsuit. Things did not get better. Therefore, Plaintiff appeals to tolling the statute of limitations where applicable.

    f.      Plaintiff made it clear to Sailer and Franze, verbally and in writing, that she/Plaintiff would not be doing marketing, specifically to her multimillion dollar account insurance/adjuster contacts.  Plaintiff, verbally and in writing, offered to do marketing but only if an agreement was put in writing specifying the percent commission and other requirements. Sailer said no to put a marketing agreement in writing with Plaintiff. Sailer was a witness and participant on July 3, 2019 when Endre told Plaintiff that she would not be doing marketing. Yet, Endre and more so Sailer time and again looked for ways to force Plaintiff to do marketing via fraudulent means.

    g.      Also, Sailer re-interpreted the sales commission by saying that Plaintiff was not eligible to combine sales and estimator commission, thus denying the 4-point commission system.  Previously both Sailer and Franze had told Plaintiff that she/Plaintiff could earn sales commission concurrently with estimator commission, but Sailer re-interpreted the commission program in order to deny concurrent commissions to Plaintiff. During a separate conversation with Mendheim, an Estimator, Mendheim told Plaintiff that she/Mendheim was of the

understanding that her/Mendheim's commission was based on the 4-pointt commission system. It seems that she also was deceived into thinking that she was getting cumulative commissions.

     h.     Because of Sailer's unethical and back-n-forth behavior, Plaintiff was convinced that Sailer was continuing the misrepresentation, fraud, and inducements that he, Endre and Cripe had put in place at hiring of Plaintiff for the purpose of unjust enrichment for themselves and BELFOR to the detriment of Plaintiff. Specifically, to force Plaintiff to raise revenue for BELFOR without proper, due, and promised compensation in order to execute/commence, fulfill, and/or complete the $1 billion dollar sell-off of BELFOR.

Reduced Compensation for Plaintiff, Si Billion Dollar Buy-Sell Requirements Not Met

70.     June 30, 2021, at the end of the commission cycle, Plaintiff earned a small estimator commission for the first time but with the reduction of the promised advanced commission the overall compensation was lower than previous semesters in which Plaintiff had not earned a commission due to low assigned revenue. Therefore, Plaintiff's overall compensation was reduced to less than the promised $75,000/year minimum/base and as written in the Employment Agreement.

71.     On June 30, 2021, BELFOR did not meet requirements to complete the $1 billion dollar sell-off of BELFOR; therefore the sell was not completed. The buyer granted BELFOR one more year to fulfill the requirements, thru June 30, 2022.  Plaintiff became aware of these details around the time Plaintiff was fired, around October 26, 2021.

Second Complaint, Defamation Per Se, Retaliatory Discharge

72.     On October 6, 2021, a job notification came in via email and Sailer assigned Lopez as the estimator, it was a high revenue commercial job with a steady commercial client.  I replied to Sailer and copied Cripe on the email asking Sailer to assign me as the estimator.  Sailer replied

with a no.  In his email response, Sailer told Plaintiff that the best way for her to obtain

opportunities is to market, that is, to develop a "book of business".  Sailer also stated that

Plaintiff had told Sailer that she would market and that due to the lack of marketing expanses

he/Sailer could tell that she had not done any marketing. These statements from Sailer about

Plaintiff are a lie and are defamatory per se. Plaintiff never told Sailer that she would market and

Plaintiff was not aware that she even had a budget, and if she had a budget was not aware what

that dollar amount budget was. Plaintiff never lied or made promises in an attempt to induce or

defraud BELFOR regarding marketing. Sailer wrote these lies about Plaintiff in order to portray

Plaintiff as a liar and a fraud. Thereby, Sailer portrayed Plaintiff of breaking the law by

committing fraud and inducement. Thus, Sailer made statements in writing about Plaitnff that

were defamatory per se. Plaintiff alleges that Sailer directed defamation per se in the context of

Plaintiff's marketing as yet another effort to try to force Plaintiff to market without proper, due,

and promised compensation to Plaintiff's multi-million dollar account insurance/adjuster

contacts and yet another effort to intimidate Plaintiff into not filing a legal Complaint in a court

of law by accusing Plaintiff of breaking the law herself. To be clear, Plaintiff did not defraud

BELFOR.

73.     BELFOR has an internal and unofficial rule that an employee may not be terminated

without a legitimate reason, such as being a liar and a fraud, fraud being actionable in a court of

law. Earlier in the year, Sailer had threatened Plaintiff to fire her if she didn't market to her multi-

million dollar contacts. In light of Plaintiff refusing to market without a specific written

agreement and in light of BELFOR not meeting the revenue/profit requirements to fulfill and

complete the $1 Billion dollar sell-off, Sailer needed the excuse of Plaintiff breaking the law in

order to be able to fire Plaintiff especially on a topic so keen to Yellen which is that of a person

who makes false promises of marketing.  Which is why Sailer lied in such a way about Plaintiff as to compare Plaintiff to Saenz in order to be able to fire Plaintiff and not pay her due, proper and promised compensation.

74.     As a similar and parallel example, a few weeks before Endre hired Plaintiff, Yellen did not allow Endre to hire Daniel Saenz.  Yellen perceived Saenz as a liar and a fraud, as someone who says he can bring in a lot of revenue via marketing but does not follow thru in bringing in that revenue that he promised.  Endre was allowed to hire Plaintiff, but in actuality, it was BELFOR who committed fraud against Plaintiff.

75.     Sailer accused Plaintiff of being a fraud, like Saenz, in order to obtain permission from Yellen to fire Plaintiff. Sailer obtained permission from Yellen and on October 26, 2021, BELFOR discharged Plaintiff, which was three weeks after Sailer directed defamation per se against Plaintiff as a liar and a fraud, just like Saenz.

76.     To be clear, Plaintiff never told Sailer that she would market and when Plaintiff was interviewed by Endre, Plaintiff specifically told Endre that she did not have a book of business so she made no guarantees as to marketing results.  Plaintiff never lied or committed misrepresentation or fraud against BELFOR in order to induce BELFOR to hire her or otherwise. Plaintiff on several occasions informed BELFOR employees and shareholders, verbally and in writing, that she would not do marketing unless there was something in writing. In reserve, it was BELFOR who hired Plaintiff with misrepresentations, inducements, and under false pretense for the purpose of accomplishing unjust enrichment to the detriment of Plaintiff by trying to force Plaintiff, without payment, to raise revenue by marketing to her multi-million dollar contacts for the purpose of executing/commencing, fulfilling and/or completing the $1 Billion

dollar sell-off of BELFOR, even though at hiring BELFOR instructed Plaintiff that she would not be marketing.

77.     Sailer's defamation per se in writing against Plaintiff was made before of Cripe. The defamation per se is not protected as it was made with malice in order to fire Plaintiff for not marketing to her multimillion dollar account insurance/adjuster contacts and in order to not pay Plaintiff her due, proper and promised compensation, which was all part of BELFOR's unethical, fraudulent, unlawful and possibly criminal activity.

78.     Additionally, BELFOR communicated to the Department of Employment Security that BELFOR discharged Plaintiff due to unmet expectations. The unmet expectations is in direct reference to the lie and fraud that Sailer made up about Plaintiff that Plaintiff had said she would market but did not. Thereby, BELFOR communicated the defamation per se to the Department of Employment Security and because of it Plaintiff was denied unemployment benefits.

79.     Also, Endre at hiring Plaintiff promised Plaintiff long-term employment. Due to that promise, the only way that BELFOR could go back on their word was if Plaintiff broke the law. Therefore, Sailer fabricated a lie in order to show Plaintiff breaking the law as a person who committed fraud against BELFOR. With that defamation per se, BELFOR had the excuse it needed to fire Plaintiff and not pay her due, proper and promised compensation.

80.     Shortly after Sailer's defamation per se, Plaintiff submitted a written complaint to Human Resources informing them of Sailer's defamation per se and related lack of commission to Plaintiff due to the diverting of commission to non-Estimators. Three weeks later on October 26, 2021, Franze on behalf of Sailer and BELFOR terminated Plaintiff's employment. BELFOR never conducted an investigation. At termination, Franze told Plaintiff that BELFOR was terminating Plaintiff because she/Plaintiff was complaining, for lack of payment among other

things, and therefore was not happy at BELFOR and since things were not going to change, it would be better for Plaintiff to leave BELFOR.  Sometime later, the Department of Employment Security (DES) denied Plaintiff unemployment benefits because BELFOR told them that Plaintiff had not met expectations, that's in reference to Sailer's defamation per se against Plaintiff.  The fact that DES denied Plaintiff unemployment benefits based on BELFOR's answer confirms that BELFOR communicated to DES the defamation per se from Sailer.

81.     Around the time that BELFOR fired Plaintiff is when Plaintiff found out that BELFOR had not met the requirements for the $1 billion dollar sell and that BELFOR had until June 30, 2022 to meet the requirements or the sell would not go thru.

82.     When Plaintiff was fired, both BELFOR offices in the Chicago area, Northbrook and Lisle, were diverting estimator commission, to avoid paying commission to the Estimators, by assigning non-Estimators as estimators, specifically on high revenue commercial jobs.

83.     Plaintiff alleges that all the misrepresentation and fraudulent activity BELFOR directed against Plaintiff, from the interview process thru the retaliatory discharge, was for the purpose of unjust enrichment for BELFOR to the detriment of Plaintiff, specifically, for the purpose of forcing Plaintiff, without payment, to execute/commence, fulfill, and/or complete the $1 billion dollar sell of BELFOR.

84.     A few months after the defamation per se incident, Plaintiff emailed Sailer and BELFOR to ask Sailer for a retraction. A retraction was not made.

                    Common Nucleus of Fact for all Counts Below: Counts I thru XIII

85.     Plaintiff re-states and re-alleges paragraphs 1 (one) through 152 (one-hundred fifty-two) as though fully set forth herein in this Complaint.

86.     Pursuant Michigan Common Law for Unjust Enrichment, Defendants unjustly enriched themselves to the detriment of Plaintiff, therefore Plaintiff asks this Honorable Court for relief.

87.     Plaintiff pleads in the alternative and independently to the Employment Agreement as permitted by Federal Rules of Procedure Rule 8(a)(3) and sites as precedent Ford Motor Co. v. Ghreiwati Auto, 945 F. Supp. 2d 851 - Dist. Court, ED Michigan 2013. The Employment Agreement and the breach of contract claim (Count VI) do not expressly or unequivocally cover the same subject matter as the unjust enrichment claim.

88.     Unjust Enrichment is separate and independent from any actionable cause or claim. Plaintiff seeks relief for damages for Unjust Enrichment separately and independently from any other cause, claim, or tort, such as but not limited to fraud.

89.     Defendants exhibited various unethical, fraudulent, unlawful and possibly also criminal actions against Plaintiff for the purpose of unjust enrichment of BELFOR and its shareholders and employees to the detriment of Plaintiff, including but not limited to: fraud in the inducement of a contract, hired under false pretenses, misrepresentation, inducement, false pretenses with intent to defraud (penal code 750.218 (7)(a)), nepotism (MCL 15.342), defamation per se (MCL 600.2911), broke promises (promissory estoppels), detrimental reliance, unpaid commissions (MCL 600.2961), taking of trade secrets, breach of contract (MCL 600.5807), retaliation, retaliatory discharge to avoid payment (common law; MCL 408.483; FLSA), spread contempt and boycott, coercion (MCL 750.462a; 42 U.S. Code 3617), intimidation (42 U.S. Code 3617), threaten, work without pay, forced labor (MCL 750.462a; 18 U.S. Code 1589; 42 U.S. Code 3617; 42 U.S. Code 12203), tried to force Plaintiff to break the law by committing fraud and unjust enrichment to the detriment of self/Plaintiff and others, fraudulent concealment (MCL

600.5855), and give false hope to Plaintiff of things getting better in order to induce Plaintiff to not file legal action.

90.     Defendants committed fraud against Plaintiff for the purpose of unjust enrichment by:

a.      First, Defendants lured Plaintiff to accept to work for BELFOR as an Estimator by offering her an appealing job offer with a promised minimum base salary of $75,000/year, a 4-point cumulative guaranteed commission plan, and long term employment. Also, Defendants lured Plaintiff to believe they would be assigning her to good, high revenue, commercial accounts and that the guaranteed cumulative commission would be based on a sizable amount of the office's annual $6,000,000 revenue.

b.      Second, Defendants forced Plaintiff to sign the Employment Agreement almost one month after she began employment. The employment agreement contained clauses that had not been presented to Plaintiff before and which were vague and would put into question the promises that were made to Plaintiff at hiring. Later, BELFOR kept changing the definitions and interpretations of the Employment Agreement in order to deny, remove, and/or decrease the financial and professional compensations and opportunities that the Defendants had promised to Plaintiff during employment interviewing and hiring. Plaintiff complained to BELFOR of their lack of payment and broken promises. BELFOR responded by stating that they were not doing anything wrong, when in actuality, they were committing fraud and unjust enrichment against Plaintiff.

c.      Third, after signing the Employment Agreement, Defendants broke their promises to Plaintiff and denied her the opportunities they had promised her. Defendants lowered Plaintiff's minimum base salary, denied her the opportunity to earn the 4-point guaranteed cumulative commission, and fired Plaintiff in retaliation. The guaranteed cumulative Estimator

commission that BELFOR denied to Plaintiff was retained by BELFOR for their own profit margin and raised revenue, the raised revenue was from Plaintiff's estimate/invoice writing which was part of her job role/description. Plaintiff's compensation as an Estimator was both, a minimum base salary and the 4-point guaranteed cumulative commission.  BELFOR lowered the salary and denied the commission to Plaintiff, and retained that money for itself.

d.      Fourth, after signing the Employment Agreement, Defendants forced Plaintiff to do marketing without compensation, without any commission/percentage. Marketing was not part of Plaintiff's Estimator job role/description. Defendants instructed Plaintiff at hiring that marketing was not part of her job as Estimator. Later, Defendants specifically tried to force Plaintiff to market to her multi-million dollar insurance/adjuster contacts for the pursue of raising revenue for BELFOR and to do so without paying Plaintiff any compensation or commission/ percentage for her marketing efforts.

e.      Plaintiff alleges that Defendants hired Plaintiff as an Estimator but with the hidden purpose of trying to force Plaintiff to raise revenue by marketing to her multi-million dollar contacts and not pay her for her efforts. Defendants exhibited various unethical, unlawful, and possibly even criminal activity to try to force Plaintiff to market to her multi-million dollar insurance/adjuster contacts and force her to raise revenue and profit/margins without due, proper, and promised compensation. After Plaintiff complained of non-payment, broken promises and refused to market to her multi-million dollar contacts without proper, due, and promised compensation, BELFOR retaliated by firing Plaintiff.

91.     The ultimate purpose of the fraud committed against Plaintiff was for BELFOR to force Plaintiff raise the revenue and the profit margin of BELFOR, without compensating Plaintiff for due, proper, and promised compensation, so that the raised revenue and raised profit margin

from Plaintiff would help execute/commence, fulfill, and/or complete the $1 Billion dollar sell-off of BELFOR.

92.     Had the Defendants and BELFOR not undermined our entire judicial system with their systemic and coordinated subversion of the laws of our land and had they fully disclosed o Plaintiff their needs for why they needed to raise revenue and profit margins for the $1 Billion dollar sell-off and had they treated Plaintiff fairly in requesting her assistance for the $1 billion dollar sell-off, instead of forcing and defrauding Plaitnff, to raise the revenue and profit margin, Plaintiff would then have negotiated a more fair and secure contract that would have been beneficial for all parties. Plaintiff would have negotiated for herself a percentage/commission based on the $lBillion dollar sell-off for her efforts to help BELFOR raise revenue and profit margin that would help execute, fulfill, and/or complete the sell-off. Plaintiff would have also negotiated for herself a percentage/commission for the increased revenue and increased profit/margins that took place because of her efforts and capacity to increase revenue and profit/margins, directly and indirectly, known and unknown. Plaintiff alleges that Defendants and BELFOR never had any intention to pay Plaintiff for her efforts to help execute/commence, fulfill, and/or complete the $lBillion dollar sell-off nor for her other efforts to raise revenue and profit/margins for the unjust enrichment of Defendants to the detriment of Plaintiff, therefore they committed fraud against Plaintiff.

93.     Defendants and BELFOR made Plaintiff a beneficiary of the $1 Billion dollar sell-off when they defrauded Plaintiff, via unjust enrichment, for the purpose of forcing Plaintiff raise revenue and raise profit margins for the purpose of executing/commencing, fulfilling, and/or completing the $1 Billion dollar sell-off. Plaintiff did facilitate raising the revenue and profit margin by but not limited to Plaintiff's Xactimate estimate writing and doing sales/marketing.

Therefore, Plaintiff requests damages in the form of a percentage/commission on the amount of $1 Billion dollars, whether the sell goes thru or not, and on all past, present and future raised revenue/profit/margin, known and unknown, directly or indirectly associated with Plaintiff, as stated herein and elsewhere in this Complaint, specifically under the section of "Damages".

94.     To summarize Defendants' fraud in how Defendants avoided paying Plaintiff her guaranteed cumulative 4-point commission for their and BELFOR's unjust enrichment to the detriment of Plaintiff, as detailed throughout this Complaint: 1) Defendants lured Plaintiff to work for BELFOR by promising her an appealing compensation that would include a guaranteed cumulative 4-point commission if the minimum revenue was met in order to effect the awarding of the commission, 2) Defendants would not assign Plaintiff enough revenue to meet the minimum revenue needed to award Plaintiff the guaranteed cumulative 4-point commission, thus Defendants prevented Plaintiff from earning the commission, 3) Defendants prevented Plaintiff from earning the commission by assigning non-estimators into the estimator role instead of assigning Plaintiff, an Estimator, into the estimator role, 4) non-estimators, such as Project Managers, who are assigned as estimators on jobs, instead of Plaintiff being assigned as an estimator on the jobs, do not have a guaranteed commission for the role of estimator that an Estimator has, therefore, the Project Manager does not get a guaranteed commission for the role of estimator, 5) by assigning a non-estimator, such as a Project Manager, to the role of estimator on a job, Defendants avoid paying commission altogether, no commission to the Estimator and no commission to the Project Manager, 6) thus, Defendants divert the guaranteed cumulative 4-point commission away from the Estimator, that is Plaintiff, and onto BELFOR for BELFOR's and Defendants' unjust enrichment to the detriment of Plaintiff. Additionally, the commission

table for the Estimator is written vaguely and is interpreted at Defendants' whim and re-interpreted to deny the 4-point commission.

95.     This fraudulent scheme to avoid paying commission to the Estimators by diverting the commission away from the Estimators and onto Defendants' pockets is a systemic fraudulent scheme that is practiced against other Estimators, in addition to Plaintiff.  Similarly and in reverse, a similar fraudulent scheme is practiced against Sales Person by forcing Estimators and Project Mangers to market. By forcing Estimators, such as Plaintiff, to market and not pay Plaintiff commission to market is a way for Defendants to avoid paying sales and marketing commission to Sales Persons and thus divert sales commission away from Sales Persons and onto Defendants' pockets. By swapping assignments, such as but not limited to assigning Project Managers as estimators and by forcing Estimators to market, is a way for Defendants to avoid paying promised, due and proper guaranteed cumulative 4-point commissions to all their employees and divert those commissions onto themselves for the unjust enrichment of the Defendants to the detriment of Plaintiff and other employees.

96.     The unjust enrichment of BELFOR to the detriment of Plaintiff caused special harm in it interfered with Plaintiff's financial and professional opportunities and long-term employment at BELFOR, which BELFOR had promised to Plaintiff and/or at least led Plaintiff to believe.

97.     The unjust enrichment of BELFOR to the detriment of Plaintiff caused Plaintiff great damages, as stated herein and elsewhere in this Complaint, specifically under the section of "Damages".

98.     Plaintiff had reasonable reliance on Defendant's promises and assurances. Plaintiff could not reasonably know that BELFOR was hiring Plaitnff for the purpose of unjust enrichment. Plaintiff's reliance on Defendant's promises and assurances turned out to be detrimental to

Case 3:22-cv-10924-RHC-CI   ECF No. 1-1, PageID.49   Filed 04/29/22   Page 43 of 54

Plaintiff. Damages pertinent to Defendants' unkept promises are included here and elsewhere in this Complaint, specifically under the section of "Damages".

99.     Defendants in a coordinated effort exhibited the unethical, fraudulent, unlawful and possibly criminal actions against Plaintiff willfully, intentionally and maliciously with the knowledge and purpose to obtain unjust enrichment to the detriment of Plaintiff, and/or with reckless disregard, and/or at least negligently. Plaintiff requests exemplary and/or punitive damages to the greatest extent. These damages and requests are included here and elsewhere in this Complaint, specifically under the section of "Damages".

100.    The ultimate purpose of Defendants' unjust enrichment was to force Plaitnff help BELFOR execute/commence, fulfill, and/or complete the $1 Billion dollar sell-off of BELFOR to the detriment of Plaintiff.

101.    Plaintiff became aware of the ultimate purpose of the unjust enrichment for the $1 billion dollar sell-off of BELFOR around October 26, 2021.  Plaintiff filed this Complaint on April 1, 2022 less than 6 (six) months later.

102.    Plaintiff appeals to fraudulent concealment (MI Code 600.5855) and requests from this Court to accept from Plaintiff a timely submission of this Complaint, to grant Plaintiff recovery of damages pertinent to the $1 billion dollar sell-off, and other pertinent requests.

103.    Plaintiff requests Declaratory Judgment, MCR 2.605, from this Court in order for Plaintiff to obtain due compensation.

104.    Plaintiff appeals to Unconscionable Contract or Clause, MCL 440.2302, for this Court to grant Plaintiff due compensation.

Count I – Defamation, Per Se

Defendants: Dale Sailer and BELFOR-USA

105.    Plaintiff re-states and re-alleges Common Nucleus of Facts for all Counts paragraphs 83 (eighty-three) through 100 (one-hundred) as though fully set forth herein in this Complaint.

106.    Pursuant MI code Section 600.2911 for defamation, per se, Defendants Sailer and BELFOR made false statements about Plaintiff and communicated those false statements in writing internally at BELFOR and externally to the Department of Employment Security therefore Plaintiff asks this Honorable Court for relief.

107.    Sailer and BELFOR made false statements about Plaintiff of breaking the law which is actionable in a court of law, such as but not limited to: lied, misrepresented herself to BEFLOR, committed fraud against BELFOR, false pretenses with intent to defraud BELFOR, MI code 750,218.

108.    Sailer and BELFOR made these statements willfully, intentionally and maliciously knowing that they were false, and/or with reckless disregard of the statements' truth or falsity, and/or at least negligently.

109.    The statements were not privileged, not opinion, not truthful, and wholly unjustified.

110.    The statements were made in order to fire Plaintiff with the excuse of Plaintiff being a fraud and breaking the law in order for BELFOR to not pay Plaintiff her due, proper and promised compensation for the unjust enrichment of all the Defendants to the detriment of Plaintiff.

111.    Three weeks after the statements of defamation per se against Plaintiff, BELFOR fired Plaintiff without paying Plaintiff her due, proper, and promised compensation.

112.    The statements caused special harm in that they interfered with Plaintiff's financial and professional opportunities and long-term employment at BELFOR, which BELFOR had promised to Plaintiff and/or at least led Plaintiff to believe.

113.    The statements caused Plaintiff great damages, as stated herein and elsewhere in this Complaint, specifically under the section of "Damages".

114.    The statements have damaged Plaintiff's reputation; Sailer and BELFOR have publicly presented Plaintiff as a fraud and lawbreaker.

115.    Defamation Per Se does not require the proof of damages; damages are listed here for the purpose of requesting pertinent relief.

116.    On January 19, 2022, Plaintiff emailed Sailer and BELFOR to request a retraction.  As of the writing of this Complaint, a retraction has not been made.

117.    The statements of defamation per se were made on October 6, 2021. Plaintiff filed this Complaint on April 1, 2022, less than 6 (six) months after the statements were made.

Count II – Hired Under False Pretenses, Misrepresentation, Inducement; Unjust

Enrichment

Defendants: Matt Endre, Dale Sailer, David Cripe, Michael Yellen,

BELFOR-Northbrook and BELFOR-USA

118.    Plaintiff re-states and re-alleges Common Nucleus of Facts for all Counts paragraphs 83 (eighty-three) through 100 (one-hundred) as though fully set forth herein in this Complaint.

119.    Pursuant Michigan Common Law for Unjust Enrichment, Defendants unjustly enriched themselves to the detriment of Plaintiff, therefore Plaintiff asks this Honorable Court for relief.

120.    Plaintiff pleads in the alternative and independently to the Employment Agreement as permitted by Federal Rules of Procedure Rule 8(a)(3) and sites as precedent Ford Motor Co. v. Ghreiwati Auto, 945 F. Supp. 2d 851 - Dist. Court, ED Michigan 2013. The Employment Agreement and the breach of contract claim (Count VI) do not expressly or unequivocally cover the same subject matter as the unjust enrichment claim.

## Count III – Promissory Estoppels

### Defendants: Matt Endre, Dale Sailer, David Cripe, Michael Yellen,

### BELFOR-Northbrook and BELFOR-USA

121.    Plaintiff re-states and re-alleges Common Nucleus of Facts for all Counts paragraphs 83 (eighty-three) through 100 (one-hundred) as though fully set forth herein in this Complaint.

122.    Pursuant Michigan Common Law for Promissory Estoppels, Defendants unjustly enriched themselves with promissory estoppels to the detriment of Plaintiff, therefore Plaintiff asks this Honorable Court for relief.

123.    Plaintiff pleads in the alternative and independently to the Employment Agreement as permitted by Federal Rules of Procedure Rule 8(a)(3) and sites as precedent Ford Motor Co. v. Ghreiwati Auto, 945 F. Supp. 2d 851 - Dist. Court, ED Michigan 2013. The Employment Agreement and the breach of contract claim (Count VI) do not expressly or unequivocally

124.    The ultimate purpose of Defendants' unjust enrichment with promissory estoppels was to force Plaitnff help BELFOR raise revenue and/or profit for BELFOR in order to execute/commence, fulfill, and/or complete the $1 Billion dollar sell-off of BELFOR to the detriment of Plaintiff.

125.    Plaintiff became aware of the ultimate purpose of the unjust enrichment with promissory estoppels pertinent to the $1 billion dollar sell-off of BELFOR around the time that BELFOR fired Plaintiff on October 26, 2021.  Plaintiff filed this Complaint on April 1, 2022, less than 6 (six) months later.

## Count IV – Unpaid Commissions

### Defendants: Matt Endre, Dale Sailer, David Cripe, Michael Yellen,

### BELFOR-Northbrook and BELFOR-USA

126.    Plaintiff re-states and re-alleges Common Nucleus of Facts for all Counts paragraphs 83 (eighty-three) through 100 (one-hundred) as though fully set forth herein in this Complaint.

127.    Pursuant The Michigan Sales Representative Act (MCL 62961), Defendants unjustly enriched themselves with unpaid commissions to the detriment of Plaintiff, therefore Plaintiff asks this Honorable Court for relief.

128.    Plaintiff pleads in the alternative and independently to the Employment Agreement as permitted by Federal Rules of Procedure Rule 8(a)(3) and sites as precedent Ford Motor Co. v. Ghreiwati Auto, 945 F. Supp. 2d 851 - Dist. Court, ED Michigan 2013. The Employment Agreement and the breach of contract claim (Count VI) do not expressly or unequivocally cover the same subject matter as the unjust enrichment with unpaid commission claim.

129.    The ultimate purpose of Defendants' unjust enrichment with unpaid commissions was to force Plaitnff help BELFOR raise revenue and/or profit for BELFOR in order to execute/commence, fulfill, and/or complete the $1 Billion dollar sell-off of BELFOR to the detriment of Plaintiff.

130.    Plaintiff became aware of the ultimate purpose of the unjust enrichment with unpaid commissions pertinent to the $1 billion dollar sell-off of BELFOR around the time that BELFOR fired Plaintiff on October 26, 2021.  Plaintiff filed this Complaint on April 1, 2022, less than 6 (six) months later.

Count V – Taking of Trade Secrets

Defendants: Matt Endre, Dale Sailer, David Cripe, Michael Yellen,

BELFOR-Northbrook and BELFOR-USA

131.    Plaintiff re-states and re-alleges Common Nucleus of Facts for all Counts paragraphs 83 (eighty-three) through 100 (one-hundred) as though fully set forth herein in this Complaint.

46

132.    Pursuant Michigan Common Law for Taking of Trade Secrets, Defendants unjustly enriched themselves with the taking of trade secrets to the detriment of Plaintiff, therefore Plaintiff asks this Honorable Court for relief.

133.    Plaintiff pleads in the alternative and independently to the Employment Agreement as permitted by Federal Rules of Procedure Rule 8(a)(3) and sites as precedent Ford Motor Co. v. Ghreiwati Auto, 945 F. Supp. 2d 851 - Dist. Court, ED Michigan 2013. The Employment Agreement and the breach of contract claim (Count VI) do not expressly or unequivocally cover the same subject matter as the unjust enrichment with taking of trade secrets claim.

134.    The ultimate purpose of Defendants' unjust enrichment with the taking of trade secrets was to force Plaitnff help BELFOR raise revenue and/or profit for BELFOR in order to execute/ commence, fulfill, and/or complete the $1 Billion dollar sell-off of BELFOR to the detriment of Plaintiff.

135.    Plaintiff became aware of the ultimate purpose of the unjust enrichment with taking of trade secrets pertinent to the $1 billion dollar sell-off of BELFOR around the time that BELFOR fired Plaintiff on October 26, 2021.  Plaintiff filed this Complaint on April 1, 2022, less than 6 (six) months later.

Count VI -  Breach of Contract

Defendants: Matt Endre, Dale Sailer, David Cripe, Michael Yellen,

BELFOR-Northbrook and BELFOR-USA

136.    Plaintiff re-states and re-alleges Common Nucleus of Facts for all Counts paragraphs 83 (eighty-three) through 100 (one-hundred) as though fully set forth herein in this Complaint.

137.    Pursuant Michigan Comp. Laws § 600.5807, Defendants unjustly enriched themselves with breach of contract to the detriment of Plaintiff, therefore Plaintiff asks this Honorable

47

138.    The ultimate purpose of Defendants' unjust enrichment with breach of contract was to force Plaitnff help BELFOR raise revenue and/or profit for BELFOR in order to execute/commence, fulfill, and/or complete the $1 Billion dollar sell-off of BELFOR to the detriment of Plaintiff.

139.    Plaintiff became aware of the ultimate purpose of the unjust enrichment with breach of contract pertinent to the $1 billion dollar sell-off of BELFOR around the time that BELFOR fired Plaintiff on October 26, 2021.  Plaintiff filed this Complaint on April 1, 2022, less than 6 (six) months later.

140.    Plaintiff requests that this Court make a judgment that the Employment Agreement between Plaitnff and BELFOR is null and void due to the unethical, fraudulent, and possibly even criminal methods in which BELFOR induced Plaintiff to sign the document.

Count VII – Retaliatory Discharge to Avoid Payment

Defendants: BELFOR-Northbrook and BELFOR-USA

141.    Plaintiff re-states and re-alleges Common Nucleus of Facts for all Counts paragraphs 83 (eighty-three) through 100 (one-hundred) as though fully set forth herein in this Complaint.

142.    Pursuant FLSA 1938 29 U.S.C. 201, et seq. § 215(a)(3) and § 216, MCL 408.483 and pursuant Michigan Common Law for Retaliatory Discharge to Avoid Payment, Defendants unjustly enriched themselves with retaliatory discharge to avoid payment to the detriment of Plaintiff, therefore Plaintiff asks this Honorable Court for relief.

143.    The ultimate purpose of Defendants' unjust enrichment with retaliatory discharge to avoid payment was to force Plaitnff help BELFOR raise revenue and/or profit for BELFOR in order to execute/commence, fulfill, and/or complete the $1 Billion dollar sell-off of BELFOR to the detriment of Plaintiff.

144.     Regarding satisfaction of Public Policy, Plaintiff refused to assist BELFOR in their unjust enrichment which was and is still now being obtained via fraudulent and possibly criminal methods to the detriment of Plaintiff and many other employees at BELFOR.  When Plaintiff refused to participate in BELFOR's fraudulent and criminal methods for unjust enrichment to the detriment of self and many other employees at BELFOR, BELFOR directed at Plaintiff defamation per se of breaking the law and three weeks later fired Plaintiff for breaking the law. Breaking the law, in the form of fraud against self and others that BELFOR was trying to force or pressure Plaintiff to perform, includes but is not limited to: divert, lower or deny proper, due, and promised compensation and commission to self, sales and marketing employees, and BELFOR subcontractors for the unjust enrichment of BELFOR to the detriment of Plaintiff, other employees at BELFOR, specifically sales and marketing employees, and BELFOR subcontractors. Examples include but are not limited to and for which Plaintiff refused to participate in:

   a.   For Plaintiff to defraud the BELFOR subcontractor in order to decrease the production costs and thereby increase the profit and profit margin for BELFOR and/ or thereby lure the client to hire BELFOR for the job, for BELFOR's unjust enrichment to the detriment of the BELFOR subcontractor;

   b.   For Plaintiff to defraud BELFOR salespersons by Plaintiff doing marketing to the salespersons' contacts and clients and thereby prevent the salespersons to earn their sales/marketing commissions and thereby divert the salespersons' commissions onto BELFOR, for BELFOR's unjust enrichment to the detriment of BELFOR's salespersons.

145.     Additional, but not necessary, satisfaction of Public Policy, Defendants accused Plaintiff of breaking the law and communicated defamation per se to the Department of Employment Security who then denied Plaintiff her due unemployment benefits.  Defendants accused Plaintiff of fraud, misrepresentation and false pretenses with intent to defraud, penal code 750.218, and all three are actionable in a court of law. Plaintiff was fired three weeks after BELFOR accused Plaintiff of breaking the law. The accusation of breaking the law was defamation per se.

146.     Additional, but not necessary, satisfaction of Public Policy, Plaintiff had been complaining to BELFOR for lack of payment and lack of promised financial and professional opportunities.  The defamation per se that led to the retaliatory discharges to avoid payment was prompted following a request from Plaintiff for financial opportunities which had been promised to her. Platinif lists separately counts for unpaid commission, unjust enrichment, promissory estoppels and other counts pertinent to BELFOR's avoidance of payment due, proper and promised to plaintiff.

147.     Plaintiff became aware of the ultimate purpose of the unjust enrichment with retaliatory discharge to avoid payment pertinent to the $1 billion dollar sell-off of BELFOR around the time that BELFOR fired Plaintiff on October 26, 2021.  Plaintiff filed this Complaint on April 1, 2022, less than 6 (six) months later.

Count VIII – False Pretenses with Intent to Defraud

Defendants: Matt Endre, Dale Sailer, David Cripe, Michael Yellen,

BELFOR-Northbrook and BELFOR-USA

148.     Plaintiff re-states and re-alleges Common Nucleus of Facts for all Counts paragraphs 83 (eighty-three) through 100 (one-hundred) as though fully set forth herein in this Complaint.

149.    Pursuant Michigan penal code False Pretenses with Intent to Defraud 750.218 (7)(a),

Defendants unjustly enriched themselves with false pretenses with intent to defraud to the

detriment of Plaintiff, therefore Plaintiff asks this Honorable Court for relief.

150.    The ultimate purpose of Defendants' unjust enrichment with false pretenses with intent to

defraud was to force Plaitnff help BELFOR raise revenue and/or profit for BELFOR in order to

execute/commence, fulfill, and/or complete the $1 Billion dollar sell-off of BELFOR to the

detriment of Plaintiff.

151.    Plaintiff became aware of the ultimate purpose of the unjust enrichment with false

pretenses with intent to defraud pertinent to the $1 billion dollar sell-off of BELFOR around the

time that BELFOR fired Plaintiff on October 26, 2021.  Plaintiff filed this Complaint on April 1,

2022, less than 6 (six) months later.

Damages

152.    Defendants' actions were done willfully, intentionally and knowingly, with reckless

disregard to Plaintiff's rights. Therefore, Plaintiff requests exemplary and/or punitive damages or

other remedies as may be allowed by law, to the greatest extent allowed by law.

153.    Defendants' actions directly caused and proximately caused Plaintiff the following

damages:

154.    Economic damages: including but not limited to lost wages, commissions and benefits at

BELFOR, loss of employment opportunities, loss of financial and professional opportunities

inside and outside of BELFOR, loss of future opportunities at BELFOR, and consequential

damages as may be proven.

a.    More specific damage, including but not limited to: percentage/commission for

facilitating with the execution, fulfillment, and/or completion of the $1 billion dollar sell-off of

51

BELFOR (whether or not the sell goes thru), percentage/commission on present and future, direct and indirect, known and unknown  raised revenue and profit/margins associated with Plaintiff, reduction of salary base/minimum, unpaid commissions, diverted commissions, denial of promised and guaranteed commissions under the 4-point commission system, denial of business/client accounts, denial of financial promises and assurances, denial of future financial opportunities at BELFOR, denial of unemployment benefits, lost wages due to diverted commissions, taken/stolen trade secrets in Xactimate estimate writing and pertinent consequential high profits or commissions related to Xactimate estimate writing from Plaintiff and/or others, back pay and front pay.

155.    Non-economic damages: the psychological harm to Plaintiff including but not limited to embarrassment, humiliation, pain and suffering, mental and emotional distress; los of reputation, consequential damages and loss of potential income due to loss of reputation, exemplary and/or punitive damages as may be allowed by law, to the greatest extent allowed by law.

156.    Summary of damages per Count:

    a.  Count I:        $120,000.000.00 (one-hundred twenty-million dollars)

    b.  Count II:       $120,000.000.00 (one-hundred twenty-million dollars)

    c.  Count III:      $120,000.000.00 (one-hundred twenty-million dollars)

    d.  Count IV:      $120,000.000.00 (one-hundred twenty-million dollars)

    e.  Count V:       $120,000.000.00 (one-hundred twenty-million dollars)

    f.  Count VI:      $120,000.000.00 (one-hundred twenty-million dollars)

    g.  Count VII:     $120,000.000.00 (one-hundred twenty-million dollars)

    h.  Count VIII:    $120,000.000.00 (one-hundred twenty-million dollars)

## Jury Demand

Plaintiff demands a trial by a twelve (12) person jury.

Relief Requested

WHEREFORE, Plaintiff requests this honorable court grant the following:

a.  In excess of $75,000 damages, or in excess of minimal jurisdictional amount, against Defendant(s), as warranted by the law and the proofs, including:

      i.  Economic and non-economic damages as described above;

      ii.  The greatest possible combination of non-economic, exemplary and/or punitive damages;

b.  Back pay, front pay, and fringe benefits in an amount to be determined at trial;

c.  Costs and pre- and post judgment interest as permitted by law;

d.  Attorney fees as permitted by law;

e.  Make Plaintiff whole;

f.  Declaratory Judgment pursuant MCR 2.605;

g.  Other remedies as are just, appropriate and permitted by law or equity.

VERIFICATION

The undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated or implied to be on information and belief and as to such matters the undersigned certifies as aforesaid that she/he verily believes the same to be true.

April 1, 2022

Respectfully Submitted,

EVELIA M. NARANJO, Pro Se

3405 S. Union Ave., Apt #IF
Chicago, Illinois 60616
Telephone: (312) 622-8787
eveliasan@fuller.edu

53