**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

EVELIA M. NARANJO,

                Plaintiff,

v.                                          Case No. 22-cv-10924

BELFOR USA GROUP, INC., et al.,

                Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND
TERMINATING AS MOOT DEFENDANTS' MOTION TO EXCLUDE NEW FACTUAL
ALLEGATIONS**

        This case concerns an amalgamation of federal and state claims related to

Plaintiff Evelia M. Naranjo's termination from Defendant BELFOR USA Group, Inc.

(ECF No. 27.) Pending before the court are two related motions filed by Defendants

BELFOR USA Group, Inc., Matt Endre, Dale Sailer, David Cripe, and Michael Yellen[1]:

(1) a motion to dismiss Plaintiff's Amended Complaint (ECF No. 31); and (2) a motion to

exclude new facts and evidence first offered in Plaintiff's response to Defendants'

motion to dismiss (ECF No. 35). The former has been fully briefed (_see_ ECF Nos. 31,

33, 34); Plaintiff did not file a response to the latter. A hearing is unnecessary to resolve

these motions. (ECF No. 32.) For the reasons explained below, the court will grant the

motion to dismiss and terminate as moot the motion to exclude.

_____

[1] The court presumes that Defendants purposely did not include Defendant BELFOR-
Northbrook given their indication in their Notice of Removal that BELFOR-Northbrook is
not an existing legal entity independent from BELFOR USA Group, Inc. (ECF No. 1,
PageID.1.) Plaintiff has not directly challenged this representation or provided contrary
evidence.

## I.   BACKGROUND[2]

### A.  Plaintiff's Employment Experience

Plaintiff was employed by Defendants at their Northbrook, Illinois location from July 22, 2019 through October 26, 2021. (ECF No. 27, PageID.164.) Prior to joining Defendants' restoration company, Plaintiff worked for many years as an insurance consultant at a nationally known insurance consulting firm. (Id. at PageID.167.) While there, Plaintiff developed what she calls her "Service and Value" [sic]. (Id.) Specifically, she became uniquely skilled in writing thorough and accurate "Xactimate estimates," which are "used as invoices and proposals in the restoration and insurance industry." (Id. at PageID.167–68.) Plaintiff represents that, "due to a shortage of good and well-trained estimate writers," her "good" estimate writing skills made her capable of generating revenues and profits in the multi-million-dollar range. (Id.) "As an example, $10 million worth of invoices may be increased by $1 to $3.3 million simply by applying Plaintiff['s] good Xactimate estimate writing skills." (Id. at PageID.168.) She also learned to manage "multi-million[-]dollar commercial restoration insurance jobs" and established relationships with "insurance representatives with multi-million[-]dollar accounts." (Id. at PageID.168–69.) With her Service and Value so cultivated, Plaintiff enjoyed a favorable reputation in the insurance consulting industry. (Id. at PageID.168–69.)

### B.  Plaintiff's Interview Process and Employment Agreement

In May and June of 2019, using a recruiter to initiate contact, Defendants interviewed Plaintiff for a position in their Northbrook office. (ECF No. 27, PageID.169.)

---

[2] All factual allegations are taken from Plaintiff's Amended Complaint and are construed as true with all plausible inferences granted to Plaintiff. FED. R. CIV. P. 12(b)(6); *see JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007).

As the General Manager of BELFOR-Northbrook, Defendant Endre conducted Plaintiff's first two interviews. (Id. at PageID.169–70.) Defendant Sailer, in his capacity as Regional Manager of BELFOR-Northbrook, joined Defendant Endre for Plaintiff's third and final interview. (Id. at PageID.170.)

During the interview process, Defendant Endre indicated that Plaintiff would be paid "$75,000/year base salary as $60,000 with a supplement of $15,000 in the form of advanced commission" and "that the commission was a guaranteed 4-point commission for Plaintiff's four main responsibilities as estimator, project manager, salesperson, and account manager." (Id. at PageID.170.) He further explained that "commission is based on meeting a certain minimum revenue at the end of each commission pay period, that he as General Manager assigns the jobs to the estimators, and that the office makes about $6 million/year in revenue." (Id.) Though Plaintiff attempted to negotiate a separate commission agreement for "marketing," Defendant Endre indicated she would not be doing marketing in her role as estimator. (Id.) Plaintiff took this to mean that "she would not be going out to her insurance contacts to seek/find jobs and that marketing is the responsibility of the Salespersons at BELFOR." (Id.) Plaintiff further "informed Defendant Endre in writing that her good Xactimate estimate writing skills with her special techniques are her trade secret." (Id. at PageID.168.)  Ultimately, Plaintiff accepted Defendant's job offer to be an "estimator" over competing bids from other restoration companies. (Id. at PageID.170.)

Plaintiff started working for Defendants on July 19, 2019. (ECF No. 27, PageID.170.) On August 15, 2019, she was approached by Defendant Endre and Defendant Cripe, Regional Director of BELFOR USA Group, Inc., with an employment

contract. (ECF No. 27, PageID.171.) She asserts that "Endre and Cripe pressured [her] to sign the Employment Agreement, which had never been presented to [her] before." (Id.) As stated during her interview, the agreement contained "the schedule for the 4-point commission which was the guaranteed commission . . . in her role as estimator, and the discretionary commissions for her roles in sales, project management, and account manager." (Id.) The agreement indicated that "the minimum revenue required to effect the commission 'is NOT a quota,'" which Plaintiff took to mean she "[wa]s not required to market or go out to look for jobs." (Id.) The agreement also specified that "the [$15,000.00] advance commission could be reduced or taken away by making Plaintiff pay it back." (Id. at PageID.172.) When Plaintiff objected to this provision, Defendant Endre "assured Plaintiff that the advanced commission would not be taken away." (Id.) Any changes to the agreement required the approval of all parties. (Id.)

### C.  The Sell-Off

Somewhat simultaneously, on June 10, 2019, Defendant BELFOR USA Group, Inc., announced what Plaintiff describes as a "$1 billion sell-off." (ECF No. 27, PageID.169, 171.) She explains that:

> [a]t initiation, a buyer and a seller enter an agreement for the buy-sell with requirements that need to be met within a specific time-line in order for the sell-off to be completed. The requirements to be met are typically a specific revenue or profit margin target. Some money might be exchanged during the initiation and fulfillment stage. However, the full purchase amount is exchanged only if and after the requirements are met or exceeded.

(Id. at PageID.168–69.) Here, Defendant BELFOR USA Group, Inc., entered into the sell-off agreement around June 10, 2019, acceding to meet revenue and profit margins by June of 2021. (Id. at PageID.169.) This deadline was later extended one year (Id.)

As shareholders in the restoration company, Plaintiff emphasizes that Defendants Endre, Sailer, Cripe, and Yellen stood to gain from the transaction. (Id.) She asserts that "Defendants sought out, and needed, Plaintiff's Service and Value in order to initiate, fulfill and/or complete the $1 billion sell-off of BELFOR." (ECF No. 27, PageID.168.) She further alleges that, "[t]hroughout this entire period, Defendants, in secret from Plaintiff, were trying to make Plaintiff assist them in initiating, fulfilling, and/or completing the $[1] billion sell-off of BELFOR in order to not pay her for her Service and Value." (Id. at PageID.169.) She was "privately informed of these secret details around the time that BELFOR fired [her], which was on October 26, 2021." (Id.)

### D. Plaintiff's Termination

Plaintiff's experience at Defendants' company was not positive. In general, "Plaintiff did not obtain any commission while Endre was the General Manger, apart from the advanced commission that was part of Plaintiff's $75,000/year promised base salary." (ECF No. 27, PageID.171.) She attributes this to Defendant Endre's assignment practices, indicating that he gave himself and his brother, Martin Endre, "most commercial and most high revenue jobs" while Plaintiff received "mostly low revenue residential jobs." (Id. at PageID.171.) "Months later, Plaintiff found out that Endre as General Manager was not supposed to be assigning himself in the role as estimator," that is, "diverting estimator commission away from Plaintiff and onto himself and/or onto BELFOR-Northbrook." (Id.)

More specifically, "[i]n the Spring of 2021, shortly after and due to the COVID-19 pandemic, Endre tried to require Plaintiff to market to her multi-million[-]dollar insurance contacts." (ECF No. 27, PageID.172.) In response, Plaintiff "reminded Endre that when

he hired her, he specifically told Plaintiff that she would not be doing marketing." (Id.)
She was also "not motivated to market to her multi-million[-]dollar insurance contacts
knowing in advance that the commission would be going to Martin Endre." (Id.)
Dissatisfied with Plaintiff's reaction, "Endre retaliated by assigning Luis Lopez, a Project
Manager, as estimator instead of assigning Plaintiff, an Estimator, as the estimator on
commercial jobs."[3] (Id.) Defendant Endre additionally required Plaintiff to share her
Xactimate estimates, which she considers to be her "trade secret," with Lopez and other
Project Managers. (Id. at PageID.172–73.) "During the monthly staff meetings, Plaintiff
found out that her good Xactimate writing skills produce good and high profit margins"
and that her profit margin was, at one point, the second highest in the region. (Id. at
PageID.173.) Defendants did not pay Plaintiff any sort of commission for her profit
margins. (Id.) Rather, Plaintiff alleges that "BELFOR stole, misappropriated, and
converted [her] good Xactimate estimate writing skills which produced unjust
enrichment for Defendants to the detriment of Plaintiff." (Id.)

　　Around this time, that is early 2021, Defendant Sailer in his new capacity as
General Manager of the BELFOR-Northbrook[4] office informed Plaintiff of the following:

> 1) he would be reducing her base salary by reducing her supplemental
> advanced commission, 2) he would continue to assign Lopez as estimator
> [and] thus continue to divert commissions away from Plaintiff, and 3) that
> Plaintiff would not be eligible to earn concurrent commissions for her roles
> as estimator and salesperson; meaning, she could only earn one
> commission, either as estimator or salesperson.

---

[3] Plaintiff later found out that "the other Illinois office, located in Lisle, and under the
supervision of [Defendant] Sailer, also diverts commissions away from the Estimators
by assigning Project Managers as estimators for [in Plaintiff's opinion] the unjust
enrichment of the BELFOR office." (ECF No. 27, PageID.173.)

[4] Defendant Sailer appears to have taken Defendant Endre's GM position in early 2021.

(ECF No. 27, PageID.173–74.) This was contrary to Defendant Sailer's past position that Plaintiff "could earn multiple commissions, that is, a commission as estimator and a commission as a salesperson/marketing." (Id. at PageID.174.) Defendant Sailer further "defined the salesperson commission as a marketing commission and thereby made the marketing commission part of the guaranteed 4-point Estimator commission schedule." (Id.) Convinced Defendant Sailer was violating both the promises made to her during her interview and in her employment contract, Plaintiff submitted a formal complaint to Defendants' Human Resources Director, Teresa Franze. (Id.)

> In discussions to resolve the complaint, Plaintiff indicates as follows:
>
> 1) Sailer stated that Plaintiff's salary could be better used elsewhere to raise revenue/profit; Plaintiff took this statement as a threat to fire Plaintiff if she does not market to her multi-million[-]dollar insurance contacts, 2) Franze stated that BELFOR is not doing anything wrong, 3) and Franze stated that Plaintiff is required to do as she is told, including marketing as Sailer is requiring of her and as it is written in the contract. [sic]

(ECF No. 27, PageID.174–75.) Plaintiff disagreed with Franze's assessment of whether she was required to do marketing. (Id. at PageID.175.) She requested that a third-party mediator assist with contract definitions and their applicability and address Defendant BELOR USA Group, Inc.'s treatment of her. (Id.) Franze denied the request. (Id.) Plaintiff suspects that her salary reduction, approved by both Defendant Cripe and Defendant Yellen, CEO of BELFOR USA Group, Inc., was meant "to pressure [her] to market her multi-million[-]dollar insurance contacts" so that BELFOR USA Group, Inc., could meet its sell-off requirements. (Id. at PageId.176.)

Matters deteriorated further in October of 2021. On October 6, 2021, Defendant Sailer sent an email to Plaintiff and Defendant Cripe accusing Plaintiff of "being a liar and a fraud." (ECF No. 27, PageID.177.) More specifically, Defendant Sailer indicated

that "Plaintiff had told Sailer that she would do marketing, but since Sailer had not seen any marketing expenses from Plaintiff, he knew that she had not done any marketing." (Id.) Plaintiff denies ever indicating she would market without a specific commission and did not know she even had a marketing budget. (Id.) Defendant Sailer also made a veiled comparison of Plaintiff to Daniel Saenz—an individual Defendants did not hire because Defendant Yellen viewed him "as a liar and a fraud who says he's going to market and bring in jobs, but he does not." (Id.) Plaintiff speculates this comparison was meant to "appeal[ ] to Yellen's disapproval of liars and frauds," thereby coaxing Defendant Yellen into approving Plaintiff's eventual termination. (Id.)

Perceiving Defendant Sailer's accusations to be "defamation per se," Plaintiff submitted another formal complaint to Franze and Defendant Cripe, citing both Defendant Sailer's comments and her commission reduction. (ECF No. 27, PageID.178.) "In a [subsequent] phone conversation with Franze, Plaintiff informed Franze that the value of what BELFOR was doing to Plaintiff was in the millions, such as $20 million." (Id.) Plaintiff indicates she would have stated a higher figure had she known about the sell-off. (Id.) Three weeks later, Franze informed Plaintiff she was terminated. (Id.) "Plaintiff alleges that BELFOR fired Plaintiff in order to avoid paying [her]; [sic] specifically, the $20 million that Plaintiff had mentioned/requested to Franze." (Id.) Shortly after her termination, Plaintiff "emailed Sailer and Franze asking for a retraction of the defamation per se." (Id. at PageID.179.) No retraction was made. (Id.)

### E.  The Instant Lawsuit

Efforts were made to resolve the issues between the parties short of litigation. On March 3, 2022, a third-party mediator conducted a Skype meeting between Plaintiff and

Franze, both of whom were accompanied by counsel. (ECF No. 27, PageID.179.) The negotiations were unsuccessful. (Id.) On April 1, 2022, acting *pro se*, Plaintiff filed suit in the Circuit Court for Oakland County, Michigan. (ECF No. 1, PageID.1–2; ECF No. 1-1, PageID.7–60.) On April 29, 2022, Defendants filed a Notice of Removal to this court on federal question jurisdiction grounds. (Id.)

Plaintiff initially opposed the removal, filing a motion to remand on May 31, 2022 seeking either remand of the case to Oakland County Circuit Court or a venue transfer to the Northern District of Illinois. (ECF No. 5.) On June 14, 2022, Defendants filed a response. (ECF No. 6.) On June 27, 2022, Plaintiff filed a reply, in which she abandoned her remand and venue transfer arguments, while seeking permission from the court to amend her complaint. (ECF No. 7, PageID.116.) In light of her reply, on October 25, 2022, this court terminated as moot in part and granted in part Plaintiff's remand motion, allowing her to amend her complaint within fourteen days. (ECF No. 25, PageID.158–59.) On November 8, 2022, Plaintiff complied. (ECF No. 27.)

Plaintiff's Amended Complaint summarizes the nature of the pending action:

This is a fraud case of broken promises and breach of contract, among other claims, for purpose of Defendants' unjust enrichment to the detriment of Plaintiff. Defendants lured Plaintiff to work for BELFOR under the guise of a secure and long-term employment with a base salary and a guaranteed 4-point Estimator commission. After employment, Defendants denied Plaintiff her guaranteed 4-point Estimator commission and reduced her base salary. After Plaintiff complained of unpaid promised and contractual wages, Defendants fired Plaintiff in order to avoid payment. Additionally, Defendants kept a subversive effort in secret from Plaintiff in order to prevent Plaintiff from making a claim to the $1 billion sell-off . . .

(ECF No. 27, PageID.162–63.) She makes the following twelve claims against all Defendants, except where noted otherwise: (1) Count I, "Defamation, *Per Se*," against Defendants Sailer and BELFOR USA Group, Inc.; (2) Count II, "Promissory

Estoppel/Detrimental Reliance;" (3) Count III, "Fraudulent Concealment;" (4) Count IV,

"Misrepresentation;" (5) Count V, "Misappropriation of Taken/Stolen Trade Secrets;" (6)

Count VI, "Conversion;" (7) Count VII, "Hired Under False Pretenses, Misrepresentation,

Inducement; Unjust Enrichment/Quantum Meruit/Constructive Trust" [sic]; (8) Count VIII,

"Breach of Contract;" (9) Count IX, "Non-Payment of Wages;" (10) Count X, "Unpaid

Commissions;" (11) Count XI, "Retaliatory Discharge to Avoid Payment," against

Defendants BELFOR USA Group Inc., and BELFOR-Northbrook; and (12) Count XII,

"Vicarious Liability/Respondeat Superior," against Defendants BELFOR USA Group

Inc., and BELFOR-Northbrook. (Id. at PageID.186–96.) Collectively, Plaintiff seeks

$1,440,000,000.00 in damages as well as declaratory and injunctive relief. (Id. at

PageID.197–200.)

In reaction, on November 22, 2022, Defendants filed the pending motion to

dismiss. (ECF No. 31.) On December 14, 2022, Plaintiff filed her response. (ECF No.

33.) On December 28, 2022, Defendants filed their reply (ECF No. 34) and their motion

to exclude Plaintiff's new factual allegations (ECF No. 35).

## II.   STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint

for a failure to state a claim upon which relief can be granted. To survive a motion to

dismiss, a plaintiff must allege facts that, if accepted as true, sufficiently "state a claim to

relief that is plausible on its face." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th

Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see* FED. R.

CIV. P. 8(a)(2). "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A complaint will not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement'" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Although the court "must accept all well-pleaded factual allegations in the complaint as true," the court "need not accept as true a legal conclusion couched as a factual allegation." *Hensley Mfg.*, 579 F.3d at 609 (quoting *Twombly*, 550 U.S. at 555) (internal quotations omitted). In short, the plaintiff's complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### III.    DISCUSSION

Defendants ask the court the dismiss the entirety of Plaintiff's Amended Complaint with prejudice, arguing that "varying reasons" support the dismissal of each of Plaintiff's twelve causes of action. (ECF No. 31, PageID.211, 213.) To this end, Defendants make three general arguments: (1) the applicable statute of limitations contained in Plaintiff's Employment Agreement bars the majority of Plaintiff's claims; (2) the Amended Complaint fails to state a claim for relief because it provides insufficient facts, makes conclusory assertions, and/or merely recites the elements for each of Plaintiff's claims; and (3) even if the claims were pled with specificity, they nonetheless fail as a matter of law. (Id. at PageID.227.) Plaintiff opposes dismissal, arguing that she has sufficiently pled all twelve counts in her Amended Complaint while also attaching fifty-five pages of new exhibits to her response. (ECF Nos. 33, 33-1.) As to the new material, Defendants separately move for its exclusion. (ECF No. 35, PageID.362–66.) They alternatively contend that, even if the court were to consider Plaintiff's new

documents, the information demonstrates only that her claims are meritless and that further amendment of her complaint is futile. (ECF No. 34, PageID.355.)

### A. Consideration of Materials Outside the Pleadings

Before evaluating the parties' substantive positions regarding dismissal, the court will first address Defendants' motion to exclude (ECF No. 35), and, by extension, the broader question of what materials the court can consider in resolving the underlying motion to dismiss. When presented with a Rule 12(b)(6) motion, the court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). Put differently, unless insufficiently mentioned or tangential to a claim, "documents incorporated by reference must be considered part of the complaint[.]" *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 467–68 (6th Cir. 2014).

Here, Defendants attached the Employment Agreement as an exhibit to their motion to dismiss. (ECF No. 31-1, PageID.251–56.) The court finds the contract central to Plaintiff's claims, as she repeatedly refers to it in her Amended Complaint (*see, e.g.*, ECF No. 27, PageID.171–72, 174–75, 177, 181, 183–85) and presents a breach of contract cause of action as Count VIII (id. at PageID.191–92) as well as non-payment of wages and unpaid commissions causes of action as Counts IX and X, both of which refer to contract provisions for support (id. at PageID.192–93). Additionally, proper evaluation of Plaintiff's promissory estoppel claim would require the court to assess whether the extant Employment Agreement was somehow defective, a review that

would necessarily require thorough inspection of the agreement itself. Sufficiently incorporated by reference, the Employment Agreement will therefore be considered in the court's review of Defendants' pending motion to dismiss.[5]

Less clearcut is whether the materials Plaintiff attached as exhibits to her response have been incorporated, formally or otherwise. (ECF No. 33-1.) However, Defendants contend that consideration of these documents demonstrates only that Plaintiff's claims are meritless. (ECF No. 34, PageID.355.) The court will therefore presume, without deciding, that it can properly consider Plaintiff's exhibits in resolving Defendants' motion to dismiss. But because the court finds that dismissal under Rule 12(b)(6) is appropriate with or without consideration of Plaintiff's exhibits for reasons explained more thoroughly below, it will simply terminate as moot Defendant's motion to exclude (ECF No. 35).

### B. Contractual Statute of Limitations

Defendants first contend that the six-month statute of limitations provision contained in the Employment Agreement bars the majority of Plaintiff's claims "relating to her employment or termination," that is, Counts II, III, IV, V, VI, VII, VIII, and XII. (ECF No. 31, PageID.228–31.) They highlight that, in addition to signing her Employment Agreement, Plaintiff separately initialed and acknowledged the abbreviated statute of limitations, which states in relevant part:

> *Abbreviated Statute of Limitations* – Employee agrees that in consideration for her continued employment, **she shall not commence any action or other legal proceeding against BELFOR** and/or its predecessors, successors, assigns, subsidiaries, parent(s), affiliates, and

---

[5] Plaintiff does not appear to object to the court's consideration of the Employment Agreement, as she herself attached it as an exhibit to her response. (ECF No. 33-1, PageID.330–35.)

all past and present officers, directors, employees and agents, in their individual and representative capacities of the foregoing entities **relating to her employment or termination thereof more than six (6) months after the event complained of**, unless a shorter period is established by law, **and agrees to waive any statute of limitations to the contrary to the extent permitted by law.** Employee further understands and agrees that **the six (6) month period (or applicable shorter period) will not be extended for any reason, including continuing violations** . . .

(Id. at PageID.228; ECF No. 31-1, PageID.253) (emphasis added).

Though Plaintiff alleges that the parties were not in agreement regarding the contract terms, Defendants assert that the integration and modification clauses make the abbreviated statute of limitations effective. (ECF No. 31, PageID.229.) Those provisions provide in relevant part:

*7. Miscellaneous Provisions* –

(a) <u>Effect on Prior Agreements</u>.  This Agreement and attached Exhibits constitutes the sole and only agreement of the parties and supersedes any prior understandings or oral or written agreement between the parties respecting the subject matters contained herein.

(b) <u>Modification and Waiver</u>.  This Agreement may not be modified unless in writing, signed by both parties. No course of dealing between BELFOR and Employee shall be deemed to affect, modify, amend or discharge any provision or term of this Agreement . . .

(ECF No. 31-1, PageID.253.) Defendants also note Plaintiff's use of the word "pressured" when discussing her signing of the Employment Agreement, contending that the conclusory allegation does not invalidate the contract due to the joint drafting provision, which states in relevant part:

(g) <u>Joint Drafting; Arm's Length Negotiations</u>.  Each of the parties hereto has joined in and contributed to drafting this Agreement; there shall be no presumption favoring or burdening any one or more parties hereto based on draftsmanship. Each party herein expressly represents and warrants to all other parties hereto that: (i) before executing this Agreement, said party has fully informed itself of the terms, contents, conditions and effects of this Agreement; . . . (iii) said party has had the opportunity to seek and/or

has obtained the advice of counsel before executing this Agreement; (iv) said party has acted voluntarily and of its/his/her own free will in executing this Agreement; (v) said party is not acting under duress, whether economic or physical, in executing this Agreement . . .

(ECF No. 31, PageID.229; ECF No. 31-1, PageID.253.)

In sum, because Plaintiff was on notice of the conduct forming the bases for her claims—namely the reduction in her advanced commissions, the sharing of her Exactimate estimates, and marketing requirements—by the middle of 2021 at the latest, Defendants argue that all claims to which the six-month limitations period applies must be dismissed. (ECF No. 31, PageID.230–31.)

In response, Plaintiff argues that "[w]hen Defendants directed Defamation Per Se and Retaliatory Discharge to Avoid Payment, they reset the time-line for all the other counts[,] as these two Counts, which are not time-barred, are related to the Counts that Defendants claim are time-bared." (ECF No. 33, PageID.267.) She does not elaborate. She further contends that Defendants' "fraudulent concealment" of the sell-off and misrepresentation that "things would get better" after her complaints in early 2021 allow for "extension" or "postponement" of the contractual statute of limitations. (Id. at PageID.267–70, 279–80.)

Alternatively, Plaintiff essentially asserts that her Employment Agreement is not a valid contract "[d]ue to the ambiguous and arbitrary definitions and applications of the clauses in [it]," thus leaving her unjust enrichment and related counts intact. (Id. at PageID.271.) Though indicating that the Employment Agreement contains "many ambiguous clauses," Plaintiff focuses primarily on one provision:

*1. Employment*—Upon the terms set forth in this Agreement, BELFOR agrees to continue to employ Employee as the Estimator of its Chicago office and Employee hereby accepts such continued employment and

agrees to perform such services as would be customary of the position or
as otherwise reasonably requested from time-to-time.

(Id. at PageID.271–72.) Because of its breadth and lack of specificity, Plaintiff argues

that this clause "could justify any 'reasonable' request, whatever 'reasonable' might

mean, from asking an Estimator to clean the office bathroom, to perform a sexual favor

for job advancement." (Id Plaintiff contends that such ambiguity, which allows for the

parties to reasonably differ on whether marketing is included in Plaintiff's role as

estimator, renders the Employment Agreement invalid. (Id.)

"The notion, that free men and women may reach agreements regarding their

affairs without government interference and that courts will enforce those agreements,

is ancient and irrefutable." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 31 (Mich. 2005)

(quoting *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 782 (Mich. 2003)). [6] Under

Michigan law, "an unambiguous contractual provision is reflective of the parties' intent

as a matter of law and if the language of the contract is unambiguous, we construe and

enforce the contract as written." *Coates v. Bastian Bros., Inc.*, 503, 741 N.W.2d 539,

543 (Mich. Ct. App. 2007) (quoting *Quality Products & Concepts Co. v. Nagel Precision,*

*Inc.*, 666 N.W.2d 251 (Mich. 2003)). Here, Defendants present an abbreviated statute of

limitations provision that prohibits Plaintiff from bringing any claims against them related

to her employment or termination six months after the complained of event. Having

reviewed the Employment Agreement, the court finds the limitations provision to be

---

[6] The court analyzes the contract under the lens of Michigan law because of the
Employment Agreement's "Governing Law and Forum" provision, which selects the laws
of the state of Michigan for construction purposes. (ECF No. 33-1, PageID.333.)

unambiguous and thereby enforceable. Plaintiff's arguments to the contrary are unavailing.

Turning first to Plaintiff's timeline reset argument, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (citing *Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995); *U.S. v. Hayter Oil Co.*, 51 F.3d 1265, 1269 (6th Cir. 1995); *U.S. v. Phibbs*, 999 F.2d 1053, 1080 n. 12 (6th Cir.1993), cert. denied, 510 U.S. 1119 (1994)). Without citation to any supporting case law, Plaintiff merely announces that Defendants "reset" or "invalidated" the limitations period when they retaliatorily discharged Plaintiff and committed defamation *per se*. (ECF No. 33, PageID.267.) She does not develop the argument further.[7] As such, the court finds Plaintiff's reset contention to be the textbook skeletal argument decried in *McPherson* and deems it waived.

Moving to Plaintiff's fraudulent concealment argument, Plaintiff is generally correct that a statute of limitations period accrues only after a plaintiff discovers her cause of action when she has been injured by fraud. *See Gabelli v. S.E.C.*, 568 U.S. 442, 449 (2013). This so-called discovery rule "arose in 18th-century fraud cases as an 'exception' to the standard rule, based on the recognition that 'something different was needed in the case of fraud, where a defendant's deceptive conduct may prevent a plaintiff from even knowing that he or she has been defrauded.'" *Id.* (quoting *Merck &*

---

[7] Nor is the court aware of any case law supporting Plaintiff's argument.

*Co., Inc. v. Reynolds*, 559 U.S. 633, 643 (2010)). Here, Plaintiff claims to have been defrauded by Defendants in two ways: (1) through their concealment of the sell-off; and (2) "making Plaintiff believe that things would get better" after her initial complaint to Franze regarding Defendant Cripe in the spring of 2021. (ECF No. 33, PageID.269–70.) Neither allegation qualifies as fraudulent concealment.

Under Michigan law, for the fraudulent-concealment exception to apply, a plaintiff must "prove that the defendant committed affirmative acts or misrepresentations that were designed to prevent subsequent discovery." *Sills v. Oakland Gen. Hosp.*, 559 N.W.2d 348, 352 (Mich. Ct. App. 1996); *Mays v. Snyder*, 916 N.W.2d 227, 251 (Mich. Ct. App. 2018). "Mere silence is insufficient." *Sills*, 559 N.W.2d at 352. As to the sell-off, neither Plaintiff's Amended Complaint nor her response details affirmative steps on Defendants' part to hide the sell-off from her. Rather, if anything, Defendants simply did not mention the sell-off when interviewing Plaintiff. Passing strange, Plaintiff herself presents an internet article published June 10, 2019 that discusses the sale generally. (ECF No. 33-1, PageID.296–99.) Given its public nature, the article further undermines Plaintiff's claim of fraudulent concealment. And perhaps most importantly, Plaintiff fails to establish any legal claim whatsoever to the sell-off, instead repeatedly concluding that Defendants have been "unjustly enriched."

In the same vein, Defendants' promises that "things would get better" in no way concealed from Plaintiff her salary reduction or Defendants' marketing requests, assuming those both could support a breach of contract claim. Rather, Plaintiff knew of her salary reduction and the requests as soon as they happened. Again, "[f]raudulent concealment means employment of artifice, planned to prevent inquiry or escape

investigation, and mislead or hinder acquirement of information disclosing a right of action. The acts relied on must be of an affirmative character and fraudulent." *Doe v. Roman Catholic Archbishop of Archdiocese of Detroit*, 692 N.W.2d 398, 405 (Mich. Ct. App. 2004) (internal citations and quotations omitted). "'If there is a known cause of action there can be no fraudulent concealment which will interfere with the operation of the statute, and in this behalf a party will be held to know what he ought to know.'" *Id.* (quoting *Weast v. Duffie*, 262 N.W. 401 (1935)). An optimistic indication that "things would get better" cannot retroactively misrepresent or conceal alleged injuries that were immediately known to Plaintiff as they happened. Therefore, Plaintiff's fraudulent concealment counter misses the mark.

Finally, Plaintiff's ambiguity argument ignores the general rule of contract law "that the failure of a distinct part of a contract does not void valid, severable provisions." *Samuel D. Begola Servs., Inc. v. Wild Bros.*, 534 N.W.2d 217, 220 (Mich. Ct. App. 1995) (citing *Robinson v. A.Z. Shmina & Sons Co.*, 293 N.W.2d 661 (1980); 7A CJS, Contracts, § 331, p. 308). Under Michigan law, in "determining whether a contractual provision is severable, it is clear that the primary consideration is the intention of the parties." *Id.* (internal citations omitted). Here, the parties specifically included a "Severability" provision that states as follows:

> In case any one or more of the provisions in this Agreement shall be held to be invalid, illegal or unenforceable for any reason, the invalidity, illegality or unenforceability of any provisions shall not affect any other provision hereto. And, wherever it is reasonably possible to do so, the invalid, illegal or unenforceable provision may be modified by a court of competent jurisdiction in an attempt to give such provision the maximum effectiveness intended as originally drafted.

(ECF No. 33-1, PageID.332.) By including such an expansive severability provision, the parties clearly intended for Plaintiff's Employment Agreement to remain intact despite unforeseen flaws. Even if the "Employment" provision (ECF No. 33-1, PageID.330) is ambiguous as to whether marketing could fall into services "as otherwise reasonably requested from time-to-time" apart from those rendered in Plaintiff's general role as estimator, the court finds that language severable. As such, the court further finds the six-month abbreviated statute of limitations provision to be operative and enforceable. Therefore, the counts to which the provision applies, that is, Counts II, III, IV, V, VI, VII, VIII, and XII, must be dismissed with prejudice.

### C.  Other Grounds for Dismissal of Counts II, III, IV, V, VI, VII, VIII, and XII

Should the ambiguity extend to the customary services performed by an estimator and be deemed to pervade the entirety of the "Employment" provision, thereby wholly invalidating the Employment Agreement, alternate grounds for dismissal of Counts II, III, IV, V, VI, VII, VIII, and XII nonetheless exist, as argued by Defendants.

### 1.  Count II: Promissory Estoppel/Detrimental Reliance

Count II of Plaintiff's Amended Complaint makes a claim for promissory estoppel invoking both Michigan and Illinois law. Under Michigan law, a claim for promissory estoppel has four elements: "'(1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, (3) which in fact produced reliance or forbearance of that nature, (4) in circumstances such that the promise must be enforced if injustice is to be avoided.'" *Gason v. Dow Corning Corp.*, 674 Fed. App'x. 551, 558–59 (6th Cir. 2017) (quoting *Leila Hosp. & Health Ctr. v. Xonics Med. Sys., Inc.*, 948 F.2d 271, 275 (6th Cir. 1991)).

"The doctrine of promissory estoppel is cautiously applied," *Marrero v. McDonnell Douglas Capital Corp.*, 505 N.W.2d 275, 278 (Mich. Ct. App. 1993) (per curiam), and its "sine qua non . . . is that the promise be clear and definite," *State Bank of Standish v. Curry*, 500 N.W.2d 104, 108 (Mich. 1993). The Michigan Supreme Court has "emphasized that 'the reliance interest protected by promissory estoppel is reasonable reliance.'" *DBI Investments, LLC v. Blavin*, 617 Fed. App'x. 374, 385 (6th Cir. 2015) (quoting *Curry*, 500 N.W.2d at 107). Similarly, under Illinois law, the elements of promissory estoppel are: "(1) defendants made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Dumas v. Infinity Broadcasting Corp.*, 416 F.3d 671, 677 (7th Cir. 2005) (quoting *Quake Construction, Inc. v. American Airlines, Inc.*, 565 N.E.2d 990, 1004 (Ill. 1990)).

Plaintiff alleges that, "[i]n a coordinated effort, Defendants and agents of BELFOR, on behalf of BELFOR, made promises to Plaintiff in the form of significant financial gain. Defendants broke those promises. Plaintiff had reasonable reliance on those promises and acted on them, to [her] detriment." (ECF No. 27, PageID.187.) The scattered nature of Plaintiff's Amended Complaint makes it difficult to ascertain the exact promises to which Plaintiff refers.[8] In her response, Plaintiff discusses three promises made by Defendant Endre: (1) a base salary of $75,000.00 with a four-point cumulative commission; (2) a guaranteed estimator commission if Plaintiff reached the minimum contract value; and (3) the BELFOR-Northbrook office generates

---

[8] The Amended Complaint merely directs the reader to the "Common Nucleus of Facts for All Counts" section, paragraphs sixty through eighty-five. (ECF No. 27, PageID.187.)

approximately $6,000,000.00 in revenue annually. (ECF No. 33, PageID.282.)
Construing Plaintiff's documents liberally, the court gathers that the gist of Plaintiff's
alleged injury is the $15,000.00 cut to her salary when her advanced commission was
taken away.

Plaintiff fails to establish that Defendants made an unambiguous promise to pay
her that $15,000.00 sum. Rather, her own evidence reflects a lack of clarity on whether
Plaintiff would be paid the $15,000.00 "advanced commission," if she did not meet basic
commission requirements. (ECF No. 33-1, PageID.338–41.) When Plaintiff objected to
commission claw back provision in the Employment Agreement, she contacted
Defendant Endre. Defendant Endre indicated, "I have never heard of anyone having to
pay back. I agree but I never saw the [contract] language nor would I ever ask for it
back." (Id. at PageID.339.) Plaintiff responded, "Ok, thank you. I'll take that as a
confirmation. If BELFOR comes after me, I'll just tell them 'Matt said no.'" (Id.)
Defendant Endre then forwarded that exchange to Defendant Cripe stating, "See below.
I assume we usually don't ask for it back." (Id. at PageID.338.) Defendant Cripe
responded, "I have yet to ever do that. You can just tell her we have strong contracts
just in case but we treat people fairly." (Id.) Defendant Endre then forwarded Defendant
Cripe's response to Plaintiff, to which she replied, "Thank you, Matt. I appreciate Dave's
response. I will interpret Dave's 'we treat people fairly' as: BELFOR will not require
Evelia to 'pay back' said agreed commission. At your discretion, please inform Dave of
my appreciation of BELFOR's fair treatment and my corresponding interpretation of
BELFOR's fair treatment." (Id.)

The court does not view this exchange to be a clear and definite promise to pay Plaintiff a $75,000.00 salary, as Defendant Cripe directly references the strength of the contract, which allows for Defendants to require repayment of the advanced commission under certain circumstances. The fact that Plaintiff provided an "interpretation" of what constitutes "fair treatment" reinforces this finding. Because she has failed to plead facts demonstrating a definite, unambiguous promise, Plaintiff's promissory estoppel claim cannot survive Defendants' Rule 12(b)(6) motion.

### 2. Count III: Fraudulent Concealment

Count III of Plaintiff's Amended Complaint makes a claim of fraudulent concealment under both Michigan and Illinois law. Under Michigan law, the elements of a fraudulent concealment action are "'(1) a material representation which is false; (2) known by defendant to be false, or made recklessly without knowledge of its truth or falsity; (3) that defendant intended plaintiff to rely upon the representation; (4) that, in fact, plaintiff acted in reliance upon it; and (5) thereby suffered injury.'" *McMullen v. Joldersma*, 435 N.W.2d 428, 430 (Mich. Ct. App. 1988) (quoting *Jaffa v. Shacket*, 319 N.W.2d 604 (Mich. App. Ct. 1982)). Likewise, to state a claim for fraudulent concealment under Illinois law, a plaintiff must allege the following elements:

> (1) the defendant concealed a material fact under circumstances that created a duty to speak; (2) the defendant intended to induce a false belief; (3) the plaintiff could not have discovered the truth through reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and justifiably relied upon the defendant's silence as a representation that the fact did not exist; (4) the concealed information was such that the plaintiff would have acted differently had he or she been aware of it; and (5) the plaintiff's reliance resulted in damages.

*Bauer v. Giannis*, 834 N.E.2d 952, 957–58 (Ill. App. Ct. 2005).

The Amended Complaint alleges:

> In a coordinated effort, Defendants and agents of BELFOR, on behalf of
> BELFOR, made promises to Plaintiff in the form of significant financial
> gain. Defendants broke those promises because Defendants had other
> motives for Plaintiff's Services and Value, including, but not limited to,
> unjust enrichment, specifically, require Plaintiff to help initiate, fulfil and/or
> complete the $ 1 billion sell-off of BELFOR . . .

(ECF No. 27, PageID.187–88.) In the "Common Nucleus of Facts for All Counts" section

of the Amended Complaint, Plaintiff elaborates:

> Defendants kept a subversive effort in secret from Plaintiff in order to
> prevent Plaintiff from making a claim to the $1 billion sell-off of BELFOR.
> Before hire, Defendants instructed Plaintiff she would not do marketing as
> part of her job description as Estimator, thus denied her a commission for
> marketing to her multi-million dollar insurance contacts. The marketing
> commission would have been separate from and in addition to the
> guaranteed 4-point Estimator commission for her job requirements as
> Estimator. However, after hire, Defendants tried to require Plaintiff to
> market to her multi-million dollar contacts—which was in direct violation of
> promises made to her at hire and in violation of her written contract— in
> order for her to secure for BELFOR multi-million dollar jobs, and not pay
> her a commission for those Services and Value. Thereby, require Plaintiff
> to raise revenue and profit for BELFOR in order to initiate, fulfill, and/or
> complete the $1 billion sell-off of BELFOR for the unjust enrichment of
> Defendants to the detriment of Plaintiff. BELFOR kept secret from Plaintiff
> their motive regarding the $1 billion sell-off in order to prevent Plaintiff
> from making a claim to the $1 billion.

(Id. at PageID.182.)

As alluded to already by the court, the Amended Complaint fails to articulate any

deception on Defendants' part that would support a fraudulent concealment claim. It is

undisputed that Defendants did not mention the sell-off to Plaintiff. (ECF No. 31,

PageID.239.) Nonetheless, Plaintiff fails to demonstrate that she was entitled to that

information in any way or truly injured by not knowing it. Plaintiff very well could have

wanted to negotiate for a piece of the sell-off pie. But a mere desire does not translate

to a legal right. Nor is it the court's burden to find a legal theory supporting Plaintiff's

allegations. *McPherson*, 125 F.3d at 995–96. Moreover, the fact of the sale, albeit not

its full details, was within the public sphere, as early as June 10, 2019, according to

Plaintiff's own evidence. (ECF No. 33-1, PageID.296–99.) Because of these

deficiencies, Plaintiff fails to state a claim for fraudulent concealment.

### 3.  Count IV: Misrepresentation

Count IV of Plaintiff's Amended Complaint makes a claim of "Misrepresentation"

under Michigan and Illinois law. Given how Plaintiff packages her misrepresentation

claim alongside her fraudulent concealment claim, (*see* ECF No. 33. PageID.268), the

court presumes the cause of action has the same fraudulent bent. Under Michigan law,

a claim for fraudulent misrepresentation or actionable fraud generally requires a

showing that:

> (1) the defendant made a material representation; (2) the representation
> was false; (3) when the defendant made the representation, the defendant
> knew that it was false, or made it recklessly, without knowledge of its truth
> as a positive assertion; (4) the defendant made the representation with the
> intention that the plaintiff would act upon it; (5) the plaintiff acted in
> reliance upon it; and (6) the plaintiff suffered damage.

*Bergen v. Baker*, 691 N.W.2d 770, 774 (Mich. Ct. App. 2004) (citations omitted).

Virtually the same showing is required under Illinois law. *Simmons v. Campion*, 991

N.E.2d 924, 932 (Ill. App. Ct. 2013).

Plaintiff's Amended Complaint merely recites the elements of fraudulent

misrepresentation while once again incorporating paragraphs sixty through eighty-five of

the Common Nucleus of Facts for All Counts section. (ECF No. 27, PageID.188–89.) In

her response, Plaintiff expounds:

> Regarding Misrepresentation, 1) Endre promised Plaintiff a compensation
> of $75,000/year with a 4-point guaranteed cumulative commission for
> Plaintiff as Estimator, and made Plaintiff believe the commission would be

based on approximately and largely a $6 million/year contract Value. Sailer was present when Endre made the offer/promise to Plaintiff. Both Endre and Sailer knew the promise/offer would be broken via their ambiguous contract and their arbitrary definition and application of the contract, such as with the diverting of jobs/commission away from Plaintiff and onto non-Estimators. Cripe and Endre presented the contract to Plaintiff one month after hire and pressured her to sign it right away. Endre and Sailer diverted the promised and contractual jobs/commission away from Plaintiff. Sailer, Cripe, and Yellen reduced Plaintiff's promised and contractual compensation. 2) Defendants knew their promises would be broken, that their statements were false, since they made the statements for the ultimate purpose of unjust enrichment to obtain Plaintiff Value ad not pay for it. 3) Defendants made those promises in order to induce Plaintiff to accept employment with BELFOR, as Plaintiff had other job offers. 4) Plaintiff had reasonable reliance on those promises considering BELFOR is the largest restoration company in the USA with offices world-wide. 5) Damages for Plaintiff are in the millions, primarily as $1 million to $3 million in diverted commissions and a percent/commission on the $ 1 billion dollar sell-off of BELFOR which Plaintiff with her Value helped initiate, fulfill, and/or finalize.

(ECF No. 33, PageID.285–86.)

The court has already explained why Plaintiff's allegation that Defendants promised to pay her a base salary of $75,000.00 is unsupported by Plaintiff's own evidence. It will not do so again. To the extent that Plaintiff contends Defendants misrepresented her commission-based earning potential, she fails to establish that she was promised certain estimator jobs. Rather, the evidence presented at this stage in the proceedings shows that Defendant Endre indicated only that he was in charge of assigning estimator jobs, which itself prefigures that Plaintiff would not be receiving all available estimator jobs involved in the $6,000,000.00 revenue stream for the BELFOR-Northbrook office. To the extent that Plaintiff argues Defendants misrepresented the marketing component of her work, it is unclear what, if any, damages Plaintiff suffered from being asked to market because—as she herself repeatedly states—she refused to

do marketing at any point. For these reasons, Plaintiff fails to state a viable claim for fraudulent misrepresentation.

### 4. Count V: Misappropriation of Taken/Stolen Trade Secrets

Count V of Plaintiff's Amended Complaint makes a misappropriation of trade secrets claim, invoking federal, Michigan, and Illinois law. The substance of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., the Michigan Uniform Trade Secrets Act ("MUTSA"), Mich. Comp. Laws § 445.19021 *et seq.*, and the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.*, overlaps, justifying simultaneous consideration of claims brought under each respective statute. *FCA US LLC v. Bullock*, 446 F. Supp. 3d 201, 212 (E.D. Mich. 2020) (citing *Radiant Global Logistics, Inc. v. Furstenau*, 368 F. Supp. 3d 1112, 1124 n.2 (E.D. Mich. 2019)); *Mickey's Linen v. Fischer*, No. 17 C 2154, 2017 WL 3970593, *10 (N.D. Ill. Sept. 8, 2017). The elements of a claim of misappropriation of a trade secret are generally as follows: (1) the existence of a trade secret; (2) its acquisition in confidence; and (3) the defendant's unauthorized use of it. *Rothschild v. Ford Motor Co.*, 2 F. Supp. 2d 941, 950 (E.D. Mich. 1998); *see Allied Waste Servs. of N.A., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016). "Misappropriation" under MUTSA is either of the following:

(i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(ii) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:

(A) Used improper means to acquire knowledge of the trade secret.

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.

> (C) Before a material change of his or her position, knew or had
> reason to know that it was a trade secret and that knowledge of it
> had been acquired by accident or mistake.

Mich. Comp. Laws § 445.1902(b); *see also* 18 U.S.C. § 1839(5) and 765 ILCS

1065/2(b) (same definition with different formatting). "Improper means" include "theft,

bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain

secrecy or espionage through electronic or any other means," but "does not include

reverse engineering, independent derivation, or any other lawful means of acquisition."

Mich. Comp. Laws § 445.1902(a); 18 U.S.C. § 1839(6).

The Amended Complaint alleges:

> In a coordinated effort, Defendants and agents of BELFOR, specifically
> Endre and Sailer, on behalf of BELFOR, after Plaintiff indicated in writing
> that her Xactimate estimate writing skills are her trade secret, stole
> Plaintiff's trade secrets of Xactimate writing skills which produce a good
> and high revenue and profit margin. Then proceeded to disclose those
> trade secrets by giving them to Project Managers, then assigned those
> Project Managers as estimators on jobs instead of assigning Plaintiff. The
> misappropriation of the trade secrets, which was done without Plaintiff's
> permission, reduced Plaintiff's competitive advantage which had a
> negative financial impact on Plaintiff.

(ECF No. 27, PageID.189.) Elsewhere, the Amended Complaint indicates that "Endre

forced Plaintiff to share her estimates with Project Managers." (Id. at PageID.173.) It

further describes Plaintiff Xactimate estimate writing as "good," "accurate," and

"thorough" due to Plaintiff's "special techniques." (Id. at PageID.168.)

Even assuming Plaintiff's Xactimate estimate writing qualifies as a trade secret[9],

Plaintiff's misappropriation claim fails because the Amended Complaint does not allege

---

[9] Plaintiff alleges that she told Defendant Endre in writing that her Xactimate estimate
writings were her trade secret. In support of that, Plaintiff provides a text message that
she sent to Defendant Endre, wherein she indicates:

with any specificity that the writing was acquired by improper means. Rather, Plaintiff simply indicates that she was forced to share her estimates. This is woefully deficient under the *Iqbal-Twombly* standard. 556 U.S. at 678; *Twombly*, 550 U.S. at 557. Moreover, the claim lacks facial plausibility, as the court cannot draw a reasonable inference that Defendants are liable for trade secret misappropriation. Rather, it appears that Defendant Endre asked Plaintiff to give others her estimates and she complied, despite her contrary indications that these were her coveted secrets. Plaintiff did nothing to safeguard her methodology, nor did she even refuse to provide it. Therefore, dismissal under Rule 12(b)(6) is once again appropriate.

### 5. Count VI: Conversion

Count VI of Plaintiff's Amended Complaint makes a claim for conversion under Michigan and Illinois common law. In Michigan, "there are three elements to a common-law conversion claim: (1) a distinct act of dominion; (2) wrongfully exerted; and (3) over another's personal property." *Victory Estates, L.L.C. v. NPB Mortgage, L.L.C.*, 2012 WL 6913826, at *2 (Mich. Ct. App. Nov. 20, 2012). "The act is wrongful when it is inconsistent with the ownership rights of another." *Check Reporting Servs., Inc. v. Mich. Nat'l Bank—Lansing*, 478 N.W.2d 893, 900 (1991). Similarly, to prevail on a conversion claim under Illinois law, a plaintiff "must establish that (1) he has a right to the property;

---

Matt, thank you for your verbal offer. I look forward to being a part of your team. You mentioned that you has some questions regarding the estimates I wrote for you…in those estimates I didn't give you ALLL [sic] my trade secrets [winking face emoji]. Have a wonderful, wonderful weekend and I look forward to joining your team next week!

(ECF No. 33-1, PageID.337.) Given the context of Plaintiff's use of "trade secret," the court is skeptical as to whether Defendants can be charged with knowing Plaintiff possessed information that she truly considered to be trade secrets.

(2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Joe Hand Promotions, Inc. v. Lynch*, 822 F.Supp.2d 803, 806 (N.D. Ill. 2011) (quoting *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (1998)).

In a threadbare fashion, the Amended Complaint alleges:

> Defendants' calculated misappropriation and use of Plaintiff's methodology and skills in Xactimate estimate writing and other information constitutes conversion. By reason of the willful and knowing conversion by Defendants of Plaintiff's methodology and skills in Xactimate estimate writing and other information, Plaintiff has been, and unless Defendants are enjoined from further making use of such information, will continue to be greatly and irreparably harmed and injured, and will suffer the threat of loss of competitive advantage, income, profits, and clients, without having an adequate remedy at law.

(ECF No. 27, PageID.190.) Her response adds nothing of substance. (ECF No. 33, PageID.290.) Moreover, the general picture presented as to what happened—that is, Defendant Endre asked Plaintiff to share her Xactimate estimates and Plaintiff complied without refusal—does not readily lend itself a conversion claim. Thus, because Plaintiff's conversion claim suffers from the same specificity deficiencies as her misappropriation claim, *Iqbal*, 556 U.S. at 678, *Twombly*, 550 U.S. at 557, it too is ripe for dismissal.

### 6. Count VII: Hired Under False Pretenses, Misrepresentation, Inducement; Unjust Enrichment/Quantum Meruit/ Constructive Trust

Count VII appears to combine multiple claims, including that for fraudulent inducement related to Plaintiff's hiring as well as for unjust enrichment, invoking both Michigan and Illinois law. This blending of claims is improper under the court's form of pleading standards. *See* FED. R. CIV. P. 10(b). Regardless the claims raised in Count VII

are meritless for reasons already provided by the court in its consideration of Plaintiff's

promissory estoppel, fraudulent concealment, and misrepresentation claims. Plaintiff

alleges that Defendants "hired [her] under false pretenses, induced Plaintiff with

promises of financial gain, and employed various other forms of misrepresentation and

fraudulent concealment in order to unjustly enrich themselves to the detriment of

Plaintiff." (ECF No. 27, PageID.191.)

The court liberally construes Plaintiff's hiring under false pretenses allegation as

a claim for fraudulent inducement. Under Michigan law, "[p]arties are entitled to bring a

fraud-in-the-inducement action when they are induced into entering an agreement on

the basis of false representations." *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 304 (6th

Cir. 2008). Fraudulent inducement "addresses a situation where the claim is that one

party was tricked into contracting. It is based on pre-contractual conduct which is, under

the law, a recognized tort." *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d

760, 778 (E.D. Mich. 2014) (citing *Huron Tool & Eng'g Co. v. Precision Consulting

Servs., Inc.*, 532 N.W.2d 541, 544 (Mich. Ct. App. 1995)). And it "occurs where a party

materially misrepresents future conduct under circumstances in which the assertions

may reasonably be expected to be relied upon and are relied upon." *LIAC, Inc. v.

Founders Ins. Co.*, 222 F. App'x 488, 492 (6th Cir. 2007) (quoting *Samuel D. Begola

Servs., Inc.*, 534 N.W.2d at 219). In Illinois, a fraudulent-inducement claim requires:

> (a) a false statement [by the defendant]; (b) of material fact; (c) which the
> defendant knew or believed to be false; (d) with the intent to induce the
> plaintiff to act; (e) the plaintiff reasonably relied on the false statement;
> and (f) the plaintiff suffered damages a result.

*Eldridge v. Gordon Bros. Grp., L.L.C.*, 863 F.3d 66, 78 (1st Cir. 2017) (citing *Jordan v.

Knafel*, 880 N.E.2d 1061, 1069 (Ill. App. Ct. 2007)).

Plaintiff's fraudulent inducement cause of action is yet another iteration of her fraudulent concealment and misrepresentation claims. The court has discussed at length why Plaintiff has failed to establish any false material statements made by Defendants. It will not do so again.

Turning to the unjust enrichment portion of Count VII, under Michigan law, "[u]njust enrichment is defined as the unjust retention of money or benefits which in justice and equity belong to another." *Tkachik v. Mandeville*, 790 N.W.2d 260, 266–67 (Mich. 2010) (quoting *McCreary v. Shields*, 52 N.W.2d 853 (Mich. 1952)) (internal quotation marks omitted). A plaintiff alleging unjust enrichment must establish two elements: "(1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 280 (Mich. Ct. App. 2003). Correspondingly, under Illinois law, the elements of unjust enrichment are: (1) the defendant unjustly retained a benefit to the plaintiff's detriment; and (2) the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989).

Here, the Amended Complaint alleges that:

> Plaintiff provided Defendants with Services and Value which she did not get paid for. Defendants obtained substantial benefits from the use of the Services and Value provided by Plaintiff to Defendants. Defendants have not compensated Plaintiff for the full value of the Services and Value received, taken, or stolen from Plaintiff. Defendants have therefore been unjustly enriched to the detriment of Plaintiff.

(ECF No. 27, PageID.191.) In her response, Plaintiff further indicates:

> The benefits that were retained by BELFOR to the detriment of Plaintiff include, but are not limited to, about $1 million to $3 million dollars in diverted and unpaid commission to Plaintiff, raised revenue/profit that was

generated by Plaintiff's good estimate writing skills which Plaintiff was not
compensated for but should have been based on promises and contract
via a commission, and also a percent/commission on the $1 billion dollar
sell-off/Value of BELFOR which was planned out by Defendants in secret
from Plaintiff in order to prevent Plaintiff from making a claim.

(ECF No. 33, PageID.284.)

The gist of Plaintiff's unjust enrichment claim is that she should have been

compensated for (1) certain estimator jobs that were not given to her, (2) her high-profit-

margin-generating estimate writing skills, and (3) her contribution to the success of the

sell-off. But as already indicated in the court's analysis of Plaintiff's misrepresentation

claim, Plaintiff was not promised particular estimator jobs. Nor can she assert ownership

over commissions for jobs not given to her merely because her Xactimate writing

methodology may have been used to generate said commissions. Though Plaintiff

insists that her Xactimate estimate writing skills were her valuable trade secret, as

discussed in her misappropriation of trade secrets claim, she has alleged nothing in the

form of safeguarding this secret but instead appears to have given up her methodology

when asked to by Defendant Endre. The fact that Plaintiff is realizing in hindsight that

she should have negotiated some form of additional compensation for her Xactimate

methodology does not now entitle her recompense. Rather, she agreed to work as an

estimator for Defendants at a base salary of $60,000.00. She was paid that figure.

Moreover, as noted repeatedly by this court, Plaintiff has alleged nothing establishing

any sort of right to part of the sell-off, which was publicly known as early as June of

2019—before Plaintiff agreed to work for Defendants. At this stage in the proceedings,

the record reflects that Plaintiff was paid a salary to work as an Estimator for

Defendants. Though Plaintiff argues otherwise, Defendants did not unjustly retain a

benefit to Plaintiff's detriment for which they were not already appropriately compensating Plaintiff. As such, Count VII does not survive Rule 12(b)(6) muster.

### 7.  Count VIII: Breach of Contract

Plaintiff's breach of contract claim (Count VIII) would fail as a matter of law, as Plaintiff admits (ECF No. 33, PageID.272), because the first element—a contract between the parties—would be absent given the court's invalidity presumption. *See Collins v. CitiMortgage, Inc.*, 974 F. Supp. 2d 1034, 1041 (E.D. Mich. 2013) (Cook, J.); *Webster v. Edward D. Jones & Co.*, 197 F.3d 815, 819 (6th Cir. 1999). Therefore, the court need not analyze the individualized breach allegations. Were the contract in effect, as the court has already explained, the abbreviated statute of limitations would bar any claim of breach due to reduction in Plaintiff's salary or marketing requirements, as both injuries were known to Plaintiff by mid-2021 and she did not file suit until April of 2022.

### 8.  Count XII: Vicarious Liability/Respondeat Superior

Plaintiff's claim for "Vicarious Liability/Respondeat Superior" is also defective as a matter of law. While respondeat superior is a theory of liability and not an independent cause of action under Michigan law, *Arora v. Henry Ford Health Sys.*, No. 2:15-cv-13137, 2017 WL 4119946, at *6 (E.D. Mich. Sept. 18, 2017) (Murphy, J.), such a claim is a viable cause of action under Illinois law. *Washington v. Ill. Dept. of Corr.*, No. 13 C 5977, 2014 WL 253115, *4 (N.D. Ill. June 5, 2014) (quoting *Wilson v. Edward Hosp.*, 981 N.E.2d 971, 978 (Ill. 2012)). "The doctrine of *respondeat superior* allows an injured party to hold a principal vicariously liable for the conduct of his or her agent." *Oliveira-Brooks v. Re/Max Intern., Inc.*, 865 N.E.2d 252, 258 (Ill. App. Ct. 2007). Fundamentally, however, there must be an underlying injury to support a vicarious liability cause of

action. For reasons already explained, Plaintiff has failed to articulate an injury in

Counts II, III, VI, V, VI, VII, and VIII. And for reasons explained below, Plaintiff also fails

to establish a qualifying injury in Counts I, IX, X, and XI.

### D. Remaining Claims

As conceded by Defendants, the four remaining claims, Counts I, IX, X, and XI,

are not subject to the Employment Agreement's abbreviated statute of limitations

provision. They will therefore be independently evaluated under Rule 12(b)(6)'s

sufficiency standards.

### 1. Count I: Defamation Per Se

Count I of Plaintiff's Amended Complaint makes a claim for defamation per se

under Michigan law, Mich. Comp. Laws § 600.2911, and Illinois law, 740 ILCS 145 *et*

*seq.*[10] (ECF No. 27, PageID.186.) Under Michigan law, defamation per se is statutorily

defined as "[w]ords imputing a lack of chastity to any female or male" and "the uttering

and publishing of words imputing the commission of a criminal offense." Mich. Comp.

Laws § 600.2911(1); *Burden v. Elias Bros. Big Boy Rests.*, 613 N.W.2d 378, 381–83

(Mich. App. Ct. 2000). To prove defamation per se under Illinois law, Plaintiff must

establish that "(1) Defendants made a false statement about [her]; (2) that Defendants

made an unprivileged publication of that statement to a third party; and (3) that this

publication caused damages." *Manley v. Boat/U.S., Inc.*, 370 F. Supp. 3d 892, 905–06

---

[10] Defendant also cites federal law, 28 U.S.C. § 4101, which is the definitions section of
the statute concerning recognition of foreign defamation judgments. As Defendants
correctly point out, this provision is inapplicable to the suit at bar. (ECF No. 31,
PageID.244.) As such, Plaintiff fails to state a viable federal claim of defamation per se.

(citing *Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825, 838 (Ill. 2006)). The claim must also fit into one of the following categories:

> (1) words that impute the commission of a criminal offense; (2) words that impute infection with a loathsome communicable disease; (3) words that impute an inability to perform or want of integrity in the discharge of duties of office of employment; and (4) words that prejudice a party, or impute a lack of ability, in his or her trade, profession, or business.

*Seitz-Partridge v. Loyola Univ. of Chicago*, 987 N.E.2d 34, 41 (Ill. App. Ct. 2013); 740 ILCS 145/1; 740 ILCS 145/2.

Here, Plaintiff alleges that Defendant Sailer "publicly accused in writing Plaintiff of being a liar and a fraud" and Defendant BELFOR USA Group, Inc. "communicated Sailer's defamation per se against Plaintiff to the Department of Employment Security, which in turn denied Plaintiff unemployment benefits."[11] (Id.) More specifically, elsewhere in the Amended Complaint, Plaintiff indicates that:

> On October 6, 2021, via an email between Sailer, Plaintiff, and Cripe, Sailer accused Plaintiff of defamation per se. The defamation per se was not protected, as it was done willfully and maliciously to hurt Plaintiff and to pressure Plaintiff to market to her multi-million dollar contacts, which is contrary to promises made to Plaintiff at interview and in violation of the Employment Agreement. In the defamation per se, Sailer accused Plaintiff of being a liar and a fraud. Fraud and misrepresentation both are actionable in a court of law. Sailer stated in the email that Plaintiff had told Sailer that she would do marketing, but since Sailer had not seen any marketing expenses from Plaintiff, he knew that she had not done any marketing. Firstly, Plaintiff never told Sailer that she would market. Plaintiff had repeatedly told Sailer and Franze, verbally and in writing, that she would not market without a written and specific marketing commission. Secondly, Plaintiff did not even know she had a marking budget nor how much that marketing budget was. Sailer was the one who was lying in the email and did so while accusing Plaintiff of being a liar and a fraud.

---

[11] In her response, Plaintiff concedes she was incorrect about the benefits denial. (ECF No. 33, PageID.277.)

(Id. at PageID.177.) However, Plaintiff attached the referenced October 6th email to her response, which in relevant part indicates:

> Finally[,] as it relates to your future at BELFOR, the number one way to enhance your career is to develop your own book of business to layer on top of the non-client business you currently receive. (As indicated Tuesday, you have received over half of the non-local client leads this year, which is a disproportionate percentage.) You had indicated at the start of the year that you were led to believe (around your time of hire) that you could not sell, and you told me that you felt that was holding you back. I assured you nine months ago that you were not only free to sell to potential prospects/clients, but you were encouraged to do so. You seemed excited about this. As a professional in this business for many years, I assume you have numerous contacts that can be prospected. However[,] I have not seen a single expense submitted in the last nine months for any marketing efforts on your part - breakfast, lunches, conference fees, network events, etc. where you are trying to build your own client base. I encourage you to make your own success, and I will continue to assign you new leads when appropriate to do so in the context of the business.

(ECF No. 33-1, PageID.302.)

With respect to Plaintiff's defamation per se claim under Michigan law, Defendants contends that Defendant Sailer's statements do not impute criminal conduct or a lack of chastity and are therefore not actionable. (Id. at PageID.244–45.) Plaintiff attempts to salvage her Michigan law claim by countering that Defendant Sailer accused her of a crime of moral turpitude or an infamous crime when he "accused her of lying, misrepresentation, dishonesty, deceit, and fraud regarding the marketing of her insurance contacts in order to find professional and financial favor with employment at BELFOR." (ECF No. 33, PageID.278.) Plaintiff's interpretation of Defendant Sailer's email extends beyond reasonable bounds. Plainly, he indicates he did not receive expenses reflecting that Plaintiff was engaged in marketing, something he thought she was excited to do. By Plaintiff's own account this is not false, as she did not do any

marketing and reportedly would not do any marketing until she had a separate commission agreement for such services. In no way does Defendant Sailer accuse Plaintiff of lying about marketing. As such, Plaintiff fails to state a claim for defamation per se under Michigan law.

With respect to Plaintiff's defamation per se claim under Illinois law, Defendants again argue that Defendant Sailer's statements do not concern topics within 740 ILCS 145/1 or 2. (ECF No. 31, PageID.244.) Plaintiff counters that Defendant Sailer's statements could qualify as three forms of defamation per se: (1) accusing a person of committing a crime; (2) accusing a person of lacking ability or integrity in the performance of job duties; and/or (3) statements that otherwise prejudice a person in his profession or business. For reasons already explained, it is unreasonable as a matter of law to construe Defendant Sailer's email as imputing criminal behavior to Plaintiff. As for the other two bases, Plaintiff again reads too broadly into Defendant Sailer's statements. Defendant Sailer does not indicate that Plaintiff lacks the ability to market but instead openly advises her on how to grow her success. Nor can he reasonably be said to prejudice Plaintiff in the restoration business by transparently providing career advice. While Plaintiff may have had a reason to withhold her marketing services from Defendants, such a reason does not then make false or malicious Defendant Sailer's encouragement of Plaintiff to engage in marketing for her own success. In this regard, Plaintiff's defamation per se claim under Illinois law also falls short of stating a cause of action upon which relief can be granted.

## 2.  Counts IX: Non-Payment of Wages

In Count IX of her Amended Complaint, Plaintiff invokes the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, Michigan law[12], and Illinois law,[13] for a

claim of nonpayment of wages, alleging that Defendants:

> withheld or avoided making payment even though Plaintiff provided
> pertinent services. Plaintiff complained of non-payment of contractual and
> promised financial gain for her Services and Value including, but not
> limited to, Plaintiff's base salary of $75,000/year, commissions, and value
> for other torts being directed at Plaintiff, which Plaintiff was aware of at the
> time, including, but not limited to, defamation per se.

(ECF No. 27, PageID.192–93.) Construing Plaintiff's pleadings broadly, the court

understands that Plaintiff is specifically complaining about the alleged reduction in her

base salary, that is, the $15,000.00 advanced commission. However, Plaintiff's

Employment Agreement unequivocally states that her salary would be $2,307.69

biweekly for an approximate total of $60,000.00 annually. (ECF No. 33-1, PageID.330.)

The agreement further indicates:

> (b) <u>Commission</u>. In addition to the salary set forth above in subsection (a),
> the Employee shall be eligible to receive a commission (the
> "Commission") in accordance with the BELFOR Estimator Commission
> Program, a copy of which is attached hereto as Exhibit B and incorporated
> herein by reference, and which may be amended from time-to-time. The
> Employee shall be entitled to receive bi-weekly draws in an amount equal
> to $576.92 toward the Commission provided that such draws shall be
> reconciled with the actual Commission due to the Employee under the
> BELFOR Commission Program and provided further that, if, for any year
> the amount of such draw received by the Employee exceeds the amount
> earned as Commission for such year, then such excess shall be repaid to
> BELFOR by the Employee within ten (10) days of BELFOR's written
> request thereof or immediately upon termination of employment for any
> reason, voluntary or involuntary.

---

[12] Plaintiff cites to Mich. Comp. Laws § 600.5807 (the statute of limitations period for
various breach of contract actions) and The Payment of Wages and Fringe Benefits Act,
Public Act 390 of 1978 (Mich. Comp. Laws § 408.471 *et seq.*).

[13] Plaintiff cites to 810 ILCS 5/" (the Illinois Uniform Commercial Code), and 820 ILCS
115/ (the Illinois Wage Payment and Collection Act).

(Id.) The $576.92 biweekly advanced draw on Plaintiff's commission totaled approximately $15,000.00 annually.

With this more fulsome backdrop, Plaintiff's Amended Complaint utterly fails to explain how she was not appropriately compensated for her work under the terms of her contract. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557. In her response, she minimally elaborates, alleging that her advanced commission was wrongly reduced in early 2021 by $5,000.00 annually based on the email between herself, Defendant Endre, and Defendant Cripe, which she contends proves she would not have to pay back her advanced commission. (Id.) The unambiguous terms of Plaintiff's contract indicate otherwise. Moreover, the court has already explained why the emails between Plaintiff and Defendants did not constitute any sort of extra-contractual promise and why Plaintiff could not reasonably rely upon them to restructure the contract terms in accordance with her preferences. As such, Plaintiff has failed to plead sufficient facts to establish a claim for unpaid wages under the FLSA, Michigan law, or Illinois law.

### 3.  Count X: Unpaid Commissions

In Count X of her Amended Complaint, Plaintiff again invokes the FLSA, 29 U.S.C. § 201 *et seq.*, Mich. Comp. Laws § 600.5807, and various Illinois statutes, as well as the Michigan Sales Representatives Act, Mich. Comp. Laws § 600.2961, to support a claim of unpaid commissions. (ECF No. 27, PageID.193–94.) She alleges essentially that Defendants arbitrarily applied the terms of her Employment Agreement such that they wrongfully diverted commissions away from Plaintiff. (Id.) She further elaborates in her response:

> Plaintiff made a rough calculation of the diverted guaranteed Estimator commissions which Defendants denied to Plaintiff. The commissions that were directed to [Defendant] Endre, Marty Endre, Luis Lopez, and Rick Ford, all of who are not Estimators, and whose jobs should have been assigned to Plaintiff, who was an Estimator, averaged in the range from $1 million to $3 million in a two-year period that Plaintiff was employed and eligible for the 4-point commission, inclusive of arbitrary commission percentage and interest rate for late payment.

(ECF No. 33, PageID.274.)

Plaintiff's claim again suffers from a fatal lack of specificity. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557. She does not allege that commissions for certain estimator jobs remain outstanding. Rather, apparently standing solely on her capacity as "estimator," Plaintiff suggests that she should have received all possible estimator jobs available at Defendants' Northbrook office and the corresponding commissions paid out to Defendants' other non-estimator employees. The court finds no contractual support for Plaintiff's declaration. Nor can the court fashion Plaintiff's threadbare assertions into a claim under the FLSA or any state statute. *McPherson*, 125 F.3d at 995–96. As such, Count X must also be dismissed under Rule 12(b)(6).

### 4. Count XI: Retaliatory Discharge

Finally, Count XI of Plaintiff's Amended Complaint makes out a claim for retaliatory discharge under the FLSA, 29 U.S.C. § 201 *et seq.*, Michigan and Illinois common law, Michigan's Payment of Wages and Fringe Benefits Act, Mich. Comp. Laws § 408.471 *et seq.*, and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* (ECF No. 27, PageID.195–97.) Plaintiff alleges that she was wrongfully terminated due to the following reasons:

> 1) Plaintiff refused to market to her multi-million dollar insurance contacts without compensation, which was contrary to promises made to Plaintiff and in violation of her contract, 2) complaining for unpaid wages such as

base salary and commissions, which was contrary to promises made to
Plaintiff and in violation of her contract, 3) complaining for diverting
commissions away from Plaintiff, which was in violation of commission
laws, and 4) Plaintiff complained about defamation per se.

(Id. at PageID.194–95.) In her response, Plaintiff attached the two formal complaints

she made to Defendants' human resources department and various others. Dated

February 19, 2021, the first is in regard to "Request for Assistance, 2nd Memo: Dale

Sailer's GM leadership and its effects on Evelia M. Naranjo and BELFOR-Northbrook."

(ECF No. 33-1, PageID.307.) The eighteen-page document details at length Plaintiff's

problems with Defendant Sailer's leadership of the Northbrook office, culminating in the

following:

REQUESTS FOR ASSISTANCE:

A. I ask that BELFOR interview colleagues in our office to find out if/how
they are also having similar experience/observations with Dale such as 1)
being asked/forced to do work beyond their contract without compensation
or support/resources, 2) being threatened or intimidated with their
salaries/jobs for not doing what (tasks) Dale wants them to do, specifically
outside of their contract, 3) interview others in our office to confirm Dale's
behavior as detailed in this report. NOTE, PMs are being lured to do
estimating/be assigned as estimators with the "opportunity for professional
growth".

B. I ask that BELFOR interview others 1) Since Dale is deferring to Marty
to make estimator job assignments, interview Marty to find out if/how
Marty is participating with Dale to degrade me and exclude me as
estimator on jobs, not allow me to earn Estimator commission, and also to
try to get me fired. 2) Since Dale said that the decision to cut my draw was
made by a group of individuals, interview those individuals to find out
if/how they are participating with Dale to cut my draw and also to try to fire
me.

C. Our office needs help and leadership to counteract Dale's leadership
style which fosters disharmony and antagonism—these don't grow an
office, they shrink an office, they kill an office.

D. I need assistance to grow professionally and financially as an Estimator
and also in the area of sales/marketing for the benefit of BELFOR, which
Dale is not able nor willing to provide.

(Id. at PageID.324.) Dated October 7, 2021 and in regard to a "Second Formal Complaint Against Dale Sailer from Evelia M. Naranjo," the second involved the following topics:

> In summary, my complaint consists of the following, with brief details below.
>
>> 1. Unjust financial gain of others at the detriment (harm) of my (Evelia) professional and financial status,
>>
>> 2. Lies, half-truths, slander/libel against me in order to make me look bad for the purpose of establishing a reason for my discipline or termination, and inspire contempt and boycott against me,
>>
>> 3. Frustrate, manipulate, intimidate, threaten, coerce me to do sales, which is not part of my contract and for me to do sales without proper compensation.

(ECF No. 33-1, PageID.300–01.) Neither complaint mentions the FLSA or equivalent state law.

With respect to Plaintiff's claim under Michigan's Payment of Wages and Fringe Benefits Act, Mich. Comp. Laws § 408.407 *et seq.*, the act provides in pertinent part:

> (1) An employer shall not discharge an employee or discriminate against an employee because the employee filed a complaint, instituted or caused to be instituted a proceeding under or regulated by this act, testified or is about to testify in a proceeding, or because of the exercise by the employee on behalf of an employee or others of a right afforded by this act.
>
> (2) An employee who believes that he or she is discharged or otherwise discriminated against by an employer in violation of this section may file a complaint with the [labor] department alleging the discrimination within 30 days after the violation occurs. Upon receipt of the complaint, the department shall cause an investigation to be made. If, upon the investigation, the department determines that this section was violated, the department shall order the rehiring or reinstatement of an employee to his or her former position with back pay.

Mich. Comp. Laws § 408.483. Section 408.481 further provides that "a complaint filed under section 13(2) must be filed within 30 days after the alleged violation occurs." Even

assuming without deciding that Plaintiff was discharged in retaliation for seeking unpaid commissions, Plaintiff fails to demonstrate that she exhausted her administrative remedies. She does not allege filing a complaint with Michigan's labor department. As such, her Michigan law claim fails. *Cockels v. Int'l Bus. Expositions, Inc.*, 406 N.W.2d 465, 467–68 (Mich. Ct. App. 1987).[14]

To state a viable claim of retaliatory discharge under Illinois common law, a plaintiff must establish that "(1) the employer discharged the plaintiff, (2) in retaliation for the plaintiff's protected activities, and (3) the discharge violates a clear mandate of public policy." *Hubert v. Bd. of Educ. Of City of Chicago*, 169 N.E.2d 831, 836 (Ill. App. Ct. 2020). Plaintiff admits, however, that she failed to plead an appropriate public policy mandate to support her claim, dooming her common law claim. (ECF No. 33, PageID.276.) Nonetheless, she correctly points out that, while the common law tort of retaliatory discharge requires public policy support, the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.*, "requires only that the employee complain that he or she has not been paid in accordance with the provisions of the Act and that the employee was discharged or otherwise discriminated against by his or her employer." *Dichiarro v. Woodland Maint. Grp., LLC*, 196 N.E.3d 654, 662 (Ill. App. Ct. 2021). Consistently, with respect to retaliation under the FLSA, the Sixth Circuit has indicated:

> The anti-retaliation provision of FLSA provides that an employer is prohibited from "discharg[ing] or in any other manner discriminat[ing] against [an] employee because such employee has filed [a] complaint or

---

[14] Plaintiff's Michigan common law claim also fails, as Michigan's Payment of Wages and Fringe Benefits act preempts it. *Dudewicz v. Norris-Scmid, Inc.*, 503 N.W.2d 645, 650 (Mich. 1993) ("A public policy claim is sustainable . . . only where there also is not an applicable statutory prohibition against discharge in retaliation for the conduct at issue."); *see also*, *Stegall v. Resource Tech. Corp.*, --- N.W.2d ----, 2023 WL 1485667 (Mich. Ct. App. Feb. 2, 2023).

> instituted ... any proceeding under [the FLSA]." 29 U.S.C. § 215(a)(3). The
> burden-shifting analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S.
> 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to a FLSA claim of
> retaliation. *See, e.g., Moore v. Freeman*, 355 F.3d 558, 562 (6th Cir.
> 2004). To establish a prima facie case of retaliation, an employee must
> prove that (1) he or she engaged in a protected activity under the FLSA;
> (2) his or her exercise of this right was known by the employer; (3)
> thereafter, the employer took an employment action adverse to her; and
> (4) there was a causal connection between the protected activity and the
> adverse employment action. *See, e.g., Williams v. Gen. Motors Corp.*, 187
> F.3d 553, 568 (6th Cir. 1999).

*Adair v. Charter Cty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006).

Essential to claims under both the Illinois Wage Payment and Collection Act and the FLSA is engagement in protected activity. "To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011). But "[e]ven if an employer has the requisite notice, a complaint will only trigger FLSA protection if the employee lodges his complaint i) in good faith and ii) with an objectively reasonable belief that the employer's conduct is unlawful." *Spiteri v. AT&T Holdings, Inc.*, 40 F. Supp. 3d 869, 876 (E.D. Mich. 2014) (Borman, J.) (quoting *Barquin v. Monty's Sunset, L.L.C.*, 975 F. Supp. 2d 1309, 1314 (S.D. Fla. 2013)).

Here, the court finds that neither of Plaintiff's complaints were sufficiently clear for Defendants to understand them as an assertion of Plaintiff's FLSA rights. Rather, both fixate on Plaintiff's issues with Defendant Sailer's management style and her longevity with the company generally. Plaintiff certainly mentions having her advanced commission cut and being required to perform marketing without appropriate

compensation. However, it was not subjectively or objectively reasonable for Plaintiff to believe either action violated federal or state law. As to her advanced commission cut, Plaintiff's Employment Agreement unequivocally allowed for a reduction should she fail to meet certain commission standards. And as to the marketing, Plaintiff has repeatedly indicated that, while pressured to do so, she never in fact did any marketing. She therefore did no work for which she was not compensated under the terms of her Employment Agreement. Thus, because Plaintiff fails to allege that she engaged in protected conduct known to Defendants, her FLSA and Illinois Wage Payment and Collection Act retaliatory discharge claims fails under Rule 12(b)(6).

## IV. CONCLUSION

Accordingly, for the reasons stated above, IT IS ORDERED that Defendants' "Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6)" (ECF No. 31) is GRANTED.

IT IS FURTHER ORDERED that Defendants' "Motion to Exclude Plaintiff's New Factual Allegations and Evidence First Offered in Response to Defendants' Motion to Dismiss" (ECF No. 35) is TERMINATED AS MOOT.

s/Robert H. Cleland                    /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  September 6, 2023

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 6, 2023, by electronic and/or ordinary mail.

s/Kim Grimes                          /
Deputy Clerk

S:\Cleland\Cleland\EKL\Opinions & Orders\Civil\22-10924.NARANJO.MTDandMotionToExclude.EKL.docx